CIRCLE EXPRESS COMPANY, appellee, v. IOWA STATE COMMERCE
COMMISSION et al., appellants, RAILWAY EXPRESS AGENCY,
INC., et al., intervenors-appellants, CORDLE CARTAGE
COMPANY et al., intervenors-appellees.

No. 49307.

(Reported in 86 N.W.2d 888)

652

DECEMBER 17, 1957.

REHEARING DENIED FEBRUARY 14, 1958.

Conrad A. Amend, Commerce Counsel, and Richard S. Hudson, Assistant Commerce Counsel, for Iowa State Commerce Commission, appellant.

Elmer F. Slovacek, of Chicago, Illinois, and Gamble, Read, Howland, Gamble & Riepe, of Des Moines, for Railway Express Agency, Inc., intervenor-appellant.

D. C. Nolan, of Iowa City, for U. J. Haas and Cyril H. Wissel, d/b/a H. & W. Motor Express Company, intervenor-appellant.

Brody, Parker, Miller, Roberts & Thoma, of Des Moines, and Birdsall & McLendon, of Waterloo, for Circle Express Company, appellee.

Larson & Carr, of Charles City, for Cordle Cartage Company and Dewees Bus Lines, intervenors-appellees.

Gamble, Read, Howland, Gamble & Riepe, of Des Moines, for The Rock Island Motor Transit Company, intervenor-appellee.

Davis, Huebner & Johnson, of Des Moines, for The Greyhound Corporation (Overland Greyhound Lines Division), intervenor-appellee.

LARSON, J.—The principal question presented by this appeal is whether evidence relating to the present operations of the Circle Express Company justified a finding that said company was holding itself out to the public generally, expressly or by proper inference or implication, that it was willing to transport for hire a certain class of goods between certain termini or on a certain route. The Iowa State Commerce Commission, herein referred to as the "commission", thought it did, and issued a cease and desist order in view of the fact that the plaintiff-company did not possess a certificate as required by chapter 325, Code of Iowa, 1954. Resolved into terms having accepted legal significance, the question of engaging in "public transportation" in violation of chapter 325, Code of Iowa, 1954, becomes a question of whether the plaintiff-company operates as a common carrier of goods. State ex rel. Board of R. Comrs. v. Carlson, 217 Iowa 854, 855, 251 N.W. 160; State v. Campbell, 76 Iowa 122, 40 N.W. 100; State ex rel. Board of R. Comrs. v. Rosenstein, 217 Iowa 985, 989, 252 N.W. 251; State ex rel. Board of R. Comrs. v. Lischer Bros., 223 Iowa 588, 272 N.W. 604.

I. It is not the duty of the court to review findings of fact by the lower tribunal having jurisdiction, if sustained by

any competent and substantial evidence (unless of course it otherwise acted illegally), and the court should only examine the evidence submitted to determine whether there is any competent and substantial evidence to support the findings. Des Moines v. Board of Civil Service Comrs., 227 Iowa 66, 287 N.W. 288, and cases cited therein; State ex rel. Rankin v. Peisen, 233 Iowa 865, 10 N.W.2d 645; Lineberger v. Bagley, 231 Iowa 937, 2 N.W.2d 305; Luke v. Civil Service Comm., 225 Iowa 189, 279 N.W. 443; Rules of Civil Procedure 306.

■ This controversy centers largely around the status of plaintiff due to its method of operation. It has a contract carrier permit issued by the commission, and contends its operations are only those authorized under that permit. In some of our previous cases we have indicated that when the evidence is undisputed the question involving status is a law question. Bump v. District Court, 232 Iowa 623, 629, 5 N.W.2d 914; State ex rel. Rankin v. Peisen, supra; Wisdom v. Board of Supervisors, 236 Iowa 669, 683, 19 N.W.2d 602; In re Adoption of Alley, 234 Iowa 931, 937, 14 N.W.2d 742; Klatt v. Akers, 232 Iowa 1312, 1324, 5 N.W.2d 605, 146 A. L. R. 808. But such a rule must be limited to cases where the facts are such that men would not differ as to their import. This is not the case before us where the evidence raises inferences from which a fact-finding body reasonably may draw different conclusions. Luke v. Civil Service Comm., supra; Des Moines v. Board of Civil Service Comrs., supra, and cases cited therein.

Pursuant to a hearing before the Iowa State Commerce Commission held November 7, 1955, upon complaints that the plaintiff was operating in violation of chapter 325 of the Code of Iowa, 1954, the commission found "that Circle Express, Inc. * * * is holding itself out to the public, or a substantial segment of the public, as ready, willing and able to transport property offered to it with but few insignificant and immaterial limitations and qualifications; that such transportation has been and is of the 'public' character contemplated in Chapter 325; that by greatly expanding the number of transportation contracts and the ease with which such contracts have been and are entered into, Circle Express, Inc. is, in fact, operating as a common carrier under the guise of a contract carrier."

Certiorari was granted plaintiff and on January 10, 1957, the matter was presented to the District Court in and for Polk County. The learned trial court itself made certain findings of fact as well as conclusions of law, including the following: "* * * there is a total lack of evidence of any holding out by the plaintiff herein, wherein any individual or group would have the slightest right to command the use of plaintiff's transportation services, in the absence of a written contract."

The commission's order to cease and desist was set aside, and because of the illegal actions of the commission it was directed to dismiss the proceedings against plaintiff. This appeal followed, wherein the commission asserts the trial court was in error in its concept of judicial review of the commission's administrative action, erred in its application of the legal requirements as to public transportation provided in chapter 325, and erred in not finding there was substantial evidence to support the commission's action. We agree.

The record discloses plaintiff's principal place of business and only dock is in Waterloo, Iowa. It is engaged in the transportation of general commodities of limited weight and size by motor truck in an area comprising approximately the northeast quadrant of the state, servicing such cities as Des Moines, Marshalltown, Cedar Rapids, Mason City, Fort Dodge, Dubuque and Waterloo. The company has a contract carrier permit as required in chapter 327 of the Code. Its policy is to carry only for those holding contracts with the company. A recent application to the commission for a certificate of convenience and necessity to operate as a common carrier over this territory was denied. When the company commenced business in 1953 it had three panel trucks, and had 30 contracts with shippers. It now operates 12 trucks, has 361 contracts and expects to obtain more. All trucks start at Waterloo, peddle and pick up freight, and return the same day. Various routes serve 205 towns, some daily, some on Mondays, Wednesdays and Fridays, some on Tuesdays and Thursdays, etc. The exhibits include the uniform contract executed between the company and the shippers, to which is attached a rate schedule and a list of towns served. Shippers agree to send at least 10 shipments per year, and the company agrees to "carry insurance in the amount prescribed

for contract carriers." Each customer was furnished with way-bills and the drivers were not supposed to accept shipments without a waybill. Most shippers were billed twice a month for services rendered, and no contracts were entered with consignees. Though none had been canceled, these contracts were cancelable on thirty days' notice. Contracts are obtained through the solicitation of Mr. DeBlauwe, president of the company, and as a result of the recommendations of various Chamber of Commerce traffic managers. The company does not advertise, but relies upon aid from Chambers of Commerce in locating and contacting persons who might be interested in its service. Many contracts are arranged by telephone, and most are concluded after solicitation by shippers.

The company confines its transportation of freight to a certain class of commodities and particularly to those of smaller size and weight. These consist mostly of electrical products, auto parts, phonograph records, photos, meat-packing products, and certain drugs. All are reasonably classed as products the company is equipped to handle. It is true some shipments were refused, mostly due to improper wrappings or when offered in a dirty and greasy condition. The company has turned down a few shippers including Krensky of Waterloo and three large carriers, the former because "he didn't have enough shipments to make it interesting to us and his method of approach we didn't like and we didn't have to have a reason." The president said they did not want to handle department store merchandise, and so turned down a number of requests from department stores. He testified as follows:

"Q. If Quality Drug called you up and asked to enter into a contract, would you refuse? A. Not necessarily. We might go and talk with them and then decide what to do.

"Q. Depending on the size of shipment they have, quantities and number of shipments they would make? A. Plus our ability to carry them.

"Q. Then you would decide at that time? A. That's right."

So it appears if the company had the equipment and the type of shipments were suitable as to type, weight, etc., a con-

tract would likely be entered with the shipper. There was a possible exception that if the new party was in competition with one that already had a contract, it might refuse, especially if the present shipper of that commodity objected.

Out of 30 electrical supply firms doing business in Des Moines, plaintiff has contracts with 16; out of three wholesale druggists, plaintiff has two; out of two manufacturers and distributors of phonograph records in Des Moines, the company has contracts with both; out of 12 wholesale paper dealers in Des Moines, plaintiff has contracts with four or more, and has five of seven wholesalers of radio supplies listed in the Des Moines telephone directory.

Four witnesses representing common carrier operations in the same territory testified the plaintiff's operation was competitive to theirs, and of late there was a traffic loss reasonably attributable to this competition.

There were no negotiations between the parties as to terms of the general contract used, the terms were the same for substantially all parties, and changes when made were effectuated without consultation or negotiation with the shippers. Charges were not negotiated or based on time and effort to render the service, but were the same for all regardless of distance, depending on the weight alone. These were at least not the usual special contract cases of a private or contract carrier, and inferentially might be considered a bold attempt by subterfuge to get immunity from the requirements and obligations imposed by chapter 325.

 We are satisfied there was in this record competent and substantial evidence of a holding out to the general public. Statements as well as the manner in which this business is conducted, including inferential invitations to the public to apply for service, indicate that the company will transport for hire the goods of all persons indifferently, so long as it has room and the goods are of the type it assumes to carry. There is substantial evidence of much more than a mere undertaking by a special individual agreement in each particular instance to carry goods of another party. These facts appearing in the evidence, with the fair inferences to be drawn from them, must be held to be

of such import that reasonable men may draw different conclusions from them. The court should not disturb that conclusion.

It must be remembered in proceedings of this nature it is only when facts are so clear and undisputed that minds of men cannot differ as to their import that pure questions of law are resolved for the court alone to decide. Lineberger v. Bagley, supra, 231 Iowa 937, 2 N.W.2d 305, and cases cited. That is not the case before us, for here the status of the plaintiff depends upon the ultimate fact of holding out as determined by the testimony and proper inferences. It is not, therefore, under these circumstances, simply a question of law. It cannot be said that the acts complained of, plus reasonable inferences, did not justify the commission's determination that there was a holding out to publicly transport, for hire, freight of all within a certain class, indifferently, and the decision of the commission on that issue must prevail. That finding of fact the court should have accepted.

II. In 13 C. J. S., Carriers, page 26, section 3, we find: "It is a question of law for the court to determine what constitutes a common carrier", and so we may examine the record here to see if the proper concept of this service was applied. There have been various definitions of a common carrier, many of which are found in 10 C. J. 39, 13 C. J. S., page 25, section 3, and 9 Am. Jur., Carriers, section 4, page 430, but it will suffice to say that the distinctive characteristic of a common carrier is that he holds himself out as ready to engage in the transportation of goods for hire, as a public employment, and not as a casual occupation, and that he undertakes to carry for all persons indifferently, within limits of his capacity and the sphere of the business required of him. "The dominant and controlling factor in determining the status of one as a common carrier is his public profession or holding out, by words or by a course of conduct, as to the service offered or performed." 9 Am. Jur., Carriers, section 4, page 431.

In 13 C. J. S., page 26, section 3, it is said: "The test by which it is determined whether a party is a common carrier of goods is: (1) He must be engaged in the business of carrying goods for others as a public employment, and must hold himself

out as ready to engage in the transportation of goods for persons generally as a business, and not as a casual occupation. (2) He must undertake to carry goods of the kind to which his business is confined. (3) He must undertake to carry by the methods by which his business is conducted, and over his established roads. (4) The transportation must be for hire."

It is sometimes said the test is whether he has a *duty* to serve all indifferently and is liable for refusal without sufficient reasons for said refusal to act. However, we think such a test is of little value in deciding whether the conduct of the carrier is such as to make him a common carrier. Its application here tends only to confuse.

Whether such a duty attaches as a necessary incident to the relation of common carrier under any and all circumstances need not be discussed. Conceding, however, that such a duty rests upon a common carrier, to claim one is not a common carrier because he has persistently disregarded his duty and has arbitrarily chosen whom he would serve, notwithstanding the fact that he has invited the public to apply, is to make a public duty determinable by the will and pleasure of the individual, and not by principle or law. Lloyd v. Haugh & Keenan Storage & Transfer Co., 223 Pa. 148, 72 A. 516, 21 L. R. A., N. S., 188.

The question here, then, is not one of duty, but of liability. Whatever the duties may be, they do not establish or determine the relation, but result from the relation. State ex rel. Board v. Rosenstein, supra, 217 Iowa 985, 252 N.W. 251; Gornish v. Pennsylvania Public Utility Comm., 134 Pa. Super. 565, 4 A.2d 569. In United States v. Ramsey, 197 F. 144, 146, 42 L. R. A., N. S., 1031, a case cited by plaintiff, the court quotes with approval from Moore on Carriers, page 18, as follows:

" 'A common or public carrier is one who, by virtue of his business or calling, *undertakes,* for compensation, to transport personal property from one place to another, * * * for all such as may choose to employ him; and every one who *undertakes* to carry and deliver, for compensation, the goods of all persons indifferently, is, as to liability, to be deemed a common carrier.' " (Emphasis supplied.)

■ It is true many cases throughout the land have considered the various elements which may or may not distinguish the two classes of carriers. It would not help to discuss them here. We ourselves have said an occasional rejection of shipments, the restrictions of the type and kind of goods carried, or their size and weight, the fact that written contracts are required before accepting goods for shipment, or that no regular advertising was done, is not conclusive. On the other hand, in passing on a similar matter we said in State ex rel. Board v. Rosenstein, supra, at page 992 of 217 Iowa, page 255 of 252 N.W.: "* * * the statutes in question should be liberally construed to give effect to their true intent and purpose."

■ Encroachment by contract carriers in the field of service rendered by common carriers, whether by design or subterfuge, cannot be permitted. In announcing our position in the Rosenstein case as to minor limitations which would not enable a contract carrier to escape the responsibilities by law imposed upon common or public carriers, we quoted at length from Bingaman v. Public Service Comm., 105 Pa. Super. Ct. 272, 274, 161 A. 892, 893, as follows:

"We have held that in a case closely resembling the present, the presence of a contract with each customer should not be a controlling factor in the determination of the question as to whether the person or corporation is a common carrier for 'contracts, express or implied, are an incident to nearly every form of transportation, whether by common or private carriage.' "

Also see Cobb, Blasdel & Co. v. The I. C. R. R. Co., 38 Iowa 601.

In Smith v. State, 199 Ind. 217, 156 N.E. 513, the court held that one holding himself out as a common carrier does not divest himself of that status by a secret intention to reserve the right to refuse to perform the services for which he is equipped or by the fact that he does not advertise.

Also see Campbell v. A. B. C. Storage & Van Co., 187 Mo. App. 565, 174 S.W. 140; Story on Bailments, section 495.

Our decision in the Rosenstein case must also be taken as authority for the principle that where the evidence substantially discloses an offer to transport all goods of a kind for all persons

of a class, from place to place for compensation, the carrier is required to obtain a certificate of public convenience and necessity. We said therein at page 989 of 217 Iowa, page 253 of 252 N.W.: "It is not disputed that any person operating a motor truck between fixed termini or over a regular route, for the purpose of *public transportation* of freight' for compensation, is a common carrier." (Emphasis supplied.) No departure from that conclusion has come to our attention, and we doubt that it can be justly challenged.

■ III. The company's defense was based upon the contention that it exercised complete discretion as to whom it served, and did not hold itself out to serve all indifferently. The contracts were not special with the possible exception of two, and those are of no consequence. The rates were the same for all. Only a few were refused services and most of those were permissible rejections even for a common carrier. The record shows it served many parties in each class of merchandise—for instance, 16 out of 30 electrical supply houses in Des Moines, indicating a certain lack of selectivity. The company, on the other hand, could be found to have solicited business, directly or indirectly. Did this amount to a holding out expressly or by conduct to serve indifferently? Its business had grown in a few years from 30 to 361 regular customers under contract. Was this a course of conduct which by inference indicates a holding out, a willingness to serve all indifferently? We cannot say it was not, as a matter of law, and believe the trial court erred in so deciding.

While many courts seem to have applied the "duty" or "right to command" test in cases of this kind, as previously stated, we think it is useless in determining the question here involved. If there was in truth and in fact a holding out to serve all indifferently, then the carrier *must* perform the law-imposed duty to serve all by contracting with them on demand. It is a common carrier, not because it must perform duties required of the carrier, but because of a legal undertaking.

Considerable reliance is placed by plaintiff on the case of State ex rel. Board v. Carlson, supra, 217 Iowa 854, 857, 251 N.W. 160, 161, which considered the provisions of what are now chapters 325 and 327. In passing, it must be noted that

the Carlson and Rosenstein cases were injunctive actions where the facts as well as the law were properly decided by the court. Excerpts from the Carlson opinion indicate that the court used the "right to demand" test, and also passed on what would amount to public transportation. However, in holding "there is nothing in the physical situation or in the manner in which the business was either created or operated which gives the public the right to use appellee's facilities, and consequently it must be held that the appellee is not a common carrier of goods," the court was really referring to the "holding out" test, a holding out to the public which without doubt this local delivery service in Fort Dodge did not do. We do not believe the reference there to the "duty to serve" test announced more than the inquiry as to the consequence, and that the case is not out of line with our later pronouncement in the Rosenstein case that the status must be resolved from the operation which may or may not disclose a holding out of its transportation facilities for public service.

The law seems well settled that certain limitation on service, unless substantial, will not take from an operation otherwise that of a common carrier, its nature as a public service or the status of such a carrier. The true character of plaintiff's operation should be determined by what it has been doing rather than just what it says it has been doing. Gornish v. Pennsylvania Public Utility Comm., supra.

Although the trial court gave due consideration to the usual definitions of common carriers, it would appear that it gave improper consideration to the "duty to serve" test in deciding plaintiff's status as a carrier.

IV. We are satisfied there was no illegality in the concept of what amounts to common carriage by the commission, and we do not find any serious departure from the proper definition of that function by the trial court. The vital or key question which should have been considered in this certiorari proceeding before the district court may be stated thusly. From the evidence before the commission, could it be found as an ultimate fact that the plaintiff conducted its business in such a manner as to induce the public to believe that it would receive for carriage and carry the goods of any person tendered to it for

transportation over its regular routes, provided the goods were such as it holds itself out as willing to carry? If so, then the district court must uphold such findings and conclusions, and, unless other illegalities appear, affirm the commission's decision. This the district court failed to do, and thereby erred. State ex rel. Board v. Carlson and State ex rel. Board v. Rosenstein, both supra; Moore on Carriers, page 18; 10 C. J. 65, 66; 13 C. J. S. 26.

It is our conclusion that from the statements of the witnesses, the exhibits considered, and the fair inferences to be drawn from such evidence of the plaintiff's conduct, the commission could find there was such a holding out to the public as would legally constitute common carriage or the public transportation of goods under the provisions of chapter 325, Code of Iowa, 1954.

The legislature in its wisdom provided that this determination be left to the commission, which seems well equipped to perform that task, thereby preventing unjust encroachment by different classes of carriers. Clearly this function aids greatly in obtaining necessary and proper regulation of traffic and efficient transportation facilities for the state. State ex rel. Board v. Carlson, supra.

It may be said that underlying this proceeding is the problem of establishing definite areas of transportation service for the various classes of carriers, for the public benefit. The classes provided by chapters 325 and 327 generally follow the usual distinctions between common and contract carriers. Any serious encroachment could easily destroy or diminish the efficiency of both. To such an extent the public interest is affected.

Having reached the conclusion that the facts found by the commission were based on competent and substantial evidence, that it acted within its jurisdiction and in no other illegal manner, and that the trial court erred in its reversal of this determination, the decision and order of the commission must be re-established and the writ annulled.—Reversed.

All JUSTICES concur except JUSTICE SMITH.