LLOYD H. KOELLING, appellant, v. BOARD OF TRUSTEES OF
MARY FRANCES SKIFF MEMORIAL HOSPITAL,
et al., appellees.

No. 52232.

1186

November 15, 1966.

Rehearing Denied January 9, 1967.

Korf, Diehl, Clayton & Cleverley, of Newton, for appellant.

Hammer, Matthias, Tyler & Levin, of Newton, for appellees.

Cross, Hamill, Selby & Updegraff, of Newton, for appellee Laro L. Peirce.

STUART, J.—Dr. L. H. Koelling brought this action in certiorari against the Board of Trustees of the Mary Frances Skiff Memorial Hospital in Newton asserting defendants' action in indefinitely suspending plaintiff's staff privileges at the hospital was illegal and unconstitutional, exceeded the board's jurisdiction and that the findings and decision of the board were not supported by sufficient evidence. The Writ of Certiorari issued and defendants' decision was stayed until trial. After trial, the court annulled the writ and vacated the stay. Plaintiff has appealed from this final order.

Plaintiff is a licensed medical doctor. He has practiced in Newton as a member of the hospital medical staff for seventeen years. Early in the morning of June 30, 1965, he arranged for the hospital to admit Mrs. Sharon Vriezelaar. At that time she was in critical condition from the loss of blood due to a hemorrhage from the vaginal area. In the evening of June 30, the hospital administrator requested the patient to sign the standard abortion form which would relieve the attending physician and hospital from responsibility for an abortion. She refused to sign such statement claiming plaintiff had, in some way, been involved in an abortion operation performed on her. She then signed two forms. One exonerated the hospital from any responsibility. The other accused Doctor Koelling of knowingly performing "an act which may have contributed to the induction of an abortion."

This accusation precipitated an investigation by the medical staff credentials committee. The committee reported its findings and recommendations to the full medical staff. The medical staff recommended to the board of trustees that plaintiff's staff

privileges be suspended and listed eleven charges against him. All charges dealt with the manner in which he handled the case of Sharon Vriezelaar, but made no mention of the alleged abortion or Mrs. Vriezelaar's accusation.

Doctor Koelling was notified of the charges by letter dated August 14 and was advised therein that the board of trustees would hold a hearing on the medical staff's recommendations August 26. After hearing, the board sustained most of the charges filed by the staff and suspended plaintiff's staff privileges indefinitely. The certiorari proceedings challenged this decision. The trial court held the board of trustees acted within its jurisdiction, and that the decision was not illegal or unconstitutional and was supported by substantial evidence. We agree.

I. Plaintiff contends the statutes under which defendants claim authority to make rules, hold hearings, and suspend plaintiff's right to practice as a member of the staff of the municipal hospital is an unconstitutional delegation of legislative power to an administrative agency in that the statutes fail to provide sufficient standards and guidelines. He relies primarily on Lewis Consolidated School District v. Johnston, 256 Iowa 236, 127 N.W.2d 118.

Cities have the power to establish and regulate hospitals, section 368.27, Code of Iowa. By ordinance they may provide for the election of hospital trustees. Section 380.1. "Said board of trustees shall be vested with authority to provide for the management, control, and government of such city or town hospital and shall provide all needed rules and regulations for the economic conduct thereof * * *. In the management of said hospital no discrimination shall be made against practitioners of any school of medicine recognized by the laws of the state." Section 380.6.

The State Department of Health is given the power to license hospitals, chapter 135B, Code of Iowa, "to provide for the development, establishment and enforcement of basic standards (1) for the care and treatment of individuals in hospitals and (2) for the construction, maintenance and operation of such hospitals, which, in the light of existing knowledge, will

1190

promote safe and adequate treatment of such individuals in hospitals, in the interest of the health, welfare and safety of the public." Section 135B.2. It is given the power to adopt, amend, promulgate and enforce rules designed to accomplish the above purposes. Section 135B.7.

In addition to the foregoing, the operation of a city hospital is circumscribed by the statutory provisions with regard to construction requirements, inspections, public health and the practice acts appearing in the Iowa Code. While these acts do not apply directly to our immediate problem, they do limit the power of the board of trustees to manage, control and operate the hospital as they please. They could not by rule or regulation employ persons as nurses who did not qualify as provided by the Code, nor could they permit unlicensed persons to practice medicine or surgery. The facilities must meet statutory standards. We conclude the Code sections and rules provide adequate standards for the guidance of the board of trustees in the operation of the hospital.

Authorities have long made a distinction between statutes which give a state administrative agency the power to legislate on matters to be applied statewide and those which give a local governing body power to legislate on matters of local application. We distinguish this case from Lewis Consolidated School District v. Johnston, supra, on this basis as well as on the wording of the particular statutes and those in pari materia.

"It is a well settled rule, supported with practical unanimity by the authorities, that the general doctrine prohibiting the delegation of legislative authority has no application to the vesting in political subdivisions of powers to govern matters which are local in scope. For a great variety of purposes and governmental functions the legislature may delegate a part of its power over local subjects to municipal corporations, county boards, and other public bodies within the legislative classification of departments. In addition to the most frequent exercise of this power, in the case of municipalities, this principle has been employed to sustain a delegation of powers ordinarily exercisable only by the legislature to such subdivisions as township committees, park commissioners, school districts, and counties or county

boards." 16 Am. Jur.2d 500, 501; Constitutional Law, section 250. The above quotation is cited with approval in Peterson v. Cook, 175 Neb. 296, 301, 121 N.W.2d 399, 402, 403. See: 16 C. J. S. 650, 651, Constitutional Law, section 140; City of Milwaukee v. Sewerage Commission, 268 Wis. 342, 67 N.W.2d 624, 631.

 Cities have statutory authorization to enact ordinances transferring the responsibility for operation of a city hospital to the board of trustees. The board then becomes the local body charged with the responsibility of legislating on this local issue.

The Wyoming Supreme Court in Board of Trustees of Memorial Hospital v. Pratt (1953), 72 Wyo. 120, 134, 262 P.2d 682, faced the same constitutional argument when the trustees of a memorial hospital sought to deprive a physician of staff privileges for failure to abide by the rules and regulations relating to medical records. As this opinion clearly states the reasons for such position and refers to appropriate authorities, we quote:

"In Findlay v. Board of Sup'rs. of County of Mohave, 72 Ariz. 58, 230 P.2d 526, 24 A. L. R.2d 841, it is stated in the minority opinion that all the members of the court considered the regulation to exclude a physician from a public hospital as having been adopted in a legislative capacity. And we are inclined to believe that that is probably true in the case at bar. That, however, is not determinative of the question before us. It is true that, generally speaking, the legislature cannot delegate its legislative authority. 16 C. J. S., Constitutional Law, §133, p. 337. However, the constitutional provision relied upon by counsel for the appellant is not operative in all cases. If it were, municipal corporations would not be able to adopt any ordinances which are clearly legislative in character. In Cooley's Constitutional Limitations, 8th Ed. Vol. 1, p. 235, the author states that municipal corporations are exempted from the constitutional provision above mentioned by reason of the immemorial practice of municipal corporations to adopt ordinances of various kinds. And there are exceptions other than that relating to municipal corporations. Thus it is stated in 16 C. J. S., Constitutional Law, §140, p. 399, as follows: 'The general doctrine prohibiting the delegation of legislative powers

has no application to the vesting of such powers in political subdivisions created for the purpose of local government. In the absence of constitutional inhibitions, the legislature may delegate to appropriate local governmental agencies authority to legislate with regard to local affairs, to frame and enforce such bylaws, ordinances, and regulations, as are incident to local self-government, and to carry out certain functions which, although limited in their scope, are, in their performance, an exercise of sovereignty.' In 11 Am. Jur. 934, §223, it is stated: 'For a great variety of purposes and governmental functions the legislature may delegate a part of its power over local subjects to municipal corporations, county boards, and other public bodies within the legislative classification of departments.' In Maricopa County Municipal W. C. Dist. No. 1 v. LaPrade, 45 Ariz. 61, 40 P.2d 94, 99, the court stated: 'The next objection is that the act contains a number of instances of illegally delegated authority. It is universally held that the Legislature cannot delegate its power of general legislation to any individual, or group of individuals, however organized. * * * But it is also held that legislative power of a purely local nature may be delegated to political subdivisions created for the purpose of local self-government.' In re Opinion of the Justices, 78 N.H. 617, 100 A. 49, 51, the court stated: 'The nondelegable character of the lawmaking power vested in the Legislature is subject to the exception that limited powers of local legislation may be conferred upon minor subdivisions of the state.' While some of the cases speak of 'political subdivisions', they are not intended, we think, to use that term technically and as excluding a corporation such as involved herein." 262 P.2d loc. cit. 687, 688.

"It is an immemorial practice for the general government to vest in subordinate governmental branches or units, such as municipal corporations, some portion of the police power for the local self-government of such branch or unit. And it is well settled that the delegation by a state legislature to a municipal corporation of the power to legislate, subject to the paramount law, concerning local affairs, does not violate the inhibition against the delegation of the legislative function." Annotation, 79 L. Ed. 474, 492.

See also Coggins v. Board of Education of City of Durham, 223 N.C. 763, 28 S.E.2d 527, relating to school districts, and Dukes v. Shell Oil Co., 40 Del. Ch. 174, 177 A.2d 785, 790, relating to zoning ordinances.

We early recognized the distinction between delegating legislative power on a statewide basis and delegating it on a local level. Lytle v. May, 49 Iowa 224, 229, involved the constitutionality of a statute permitting people to vote to establish a Superior Court. A prior case had held the legislature could not confer upon the people the right to vote whether an Act shall become a law. We said:

"The distinction between the statutes involved in those cases and the one in this case is obvious. The latter, as we have seen, confers power upon the cities, when that power is assumed by a vote of the people; the other statutes pertained to police regulations for the whole State, which were to become operative as laws upon the vote of the people. The General Assembly may confer legislative authority upon cities to be exercised within their limits. This authority may be assumed by the vote of the people. But the power to legislate for the whole State cannot be conferred upon the people of the State. The statute before us prescribes for the assuming of authority by a city upon a vote of its people. The statutes held void by this court provide that general statutes for the whole State shall not become operative except upon a popular vote. These distinctions are obvious."

For the reasons stated and on the authorities set out above, we hold there was no unconstitutional delegation of legislative power.

II. Plaintiff urges defendants lacked jurisdiction to suspend his staff membership and privileges. He states that administrative agencies have only the power or jurisdiction conferred upon them by statute and that neither chapter 380 nor chapter 135B expressly confers upon municipal hospital trustees any such jurisdiction.

It is true the only express rule making power delegated to appellees by statute relates to the *"economic* conduct thereof." However, appellees' authority is not limited to that expressly stated in the statute.

1194

■ "The power of administrative agencies to make rules and regulations does not depend for its existence solely upon express grant. The authority of an administrative agency to adopt reasonable rules and regulations, which are deemed necessary to the due and efficient exercise of the powers expressly granted, cannot be questioned. This authority is implied from the power granted." 1 Am. Jur.2d 894, Administrative Law, section 97. See 73 C. J. S. 411, 412, Public Administrative Bodies and Procedure, section 93.

■ "It is the universal rule of statutory construction that wherever a power is conferred by statute, everything necessary to carry out the power and make it effectual and complete will be implied." Willis v. Consolidated Independent School District, 210 Iowa 391, 396, 227 N.W. 532; Travelers Insurance Co. v. Sneddon, 249 Iowa 393, 395, 86 N.W.2d 870. The law is clear that a hospital can prescribe reasonable rules concerning the qualifications of physicians to practice therein and that a license to practice does not give him the right per se to practice in a municipal hospital. Hayman v. Galveston, 273 U. S. 414, 47 S. Ct. 363, 71 L.Ed. 714; Dayan v. Wood River Township Hospital, 18 Ill. App.2d 263, 152 N.E.2d 205. Mizell v. North Broward Hospital Dist., Fla., 175 So.2d 583, 585.

Section 380.6 vests defendants "with authority to provide for the management, control, and government" of the city hospital. This grant of power carries with it the implied authority to make rules and regulations providing for such management, control and government. No aspect of this broad grant of authority is more important than the right to determine the qualifications of the practitioner who will use the hospital facilities for the treatment of his patients and such free patients as may be assigned to him. The right to determine who may use the hospital is essential for the proper protection of both the patients and hospital.

■ Hospitals may, under some circumstances, be subjected to liability for injuries sustained by patients through the negligence of a doctor using its facilities. We are persuaded the broad grant of authority to hospital trustees confers upon them the power to suspend staff privileges and membership under

proper circumstances. 26 Am. Jur. 592, Hospitals and Asylums, section 9; Dayan v. Wood River Township Hospital, 18 Ill. App.2d 263, 152 N.E.2d 205.

█ Plaintiff also argues even if there were implied authority under the statutes to suspend a doctor's staff privileges, defendants have not by by-law, rule or regulation invoked such power or provided for investigations or hearings or the procedure therefor. While the by-laws and rules are not nearly as clear and complete as seems desirable, we conclude there is authority therein for the action of the board of trustees in the instant case.

The following statements are based on the By-laws, Rules and Regulations of the Mary Frances Skiff Memorial Hospital staff which have been approved by the board of trustees:

The medical staff includes all physicians who are privileged to attend patients in the hospital. (Preamble) It is recommended that the trustees take no action to refuse to renew or cancel an appointment to the staff previously made without a conference with the medical staff. (Article II, section 4(2)) "Privileges granted to physicians who have been appointed to the medical staff shall be recommended by the credentials committee." (Article V, section 1) "Determination of initial privileges and assignment to sections shall be based upon an applicant's training, experience and demonstrated competence." (Article V, section 1(1)) "Determination of extension of further privileges shall be based upon an applicant's training, experience and demonstrated competence which shall be evaluated by review of the applicant's credentials, direct observation by the active medical staff, and review of reports of the Medical Records and Tissues Committee, as provided elsewhere in these By-laws." (Article V, section 2(2)) "The Credentials Committee shall consist of the four members of the Active Staff who compose the Executive Committee. Its duties shall be to investigate the credentials of all applications for membership and to make recommendations in conformity with Article V, section 2 of these By-laws; to investigate any breach of ethics that may be reported; to review any records that may be referred by the Executive, Medical Records, and Tissue Committees and to arrive at a decision regarding the performance of the staff members, or to refer the

case to the full active medical staff if this is considered desirable; to review all information available regarding the competence of staff members and as a result of such review to make recommendations for the granting of privileges, reappointments, and the assignment of members of the various (sections) as provided for in previous Articles of these By-laws." (Article VI, Section 2)

"Removal of a staff member from any previously assigned section may be carried out at the discretion of the Active Medical Staff." (Article IV)

Appointment to the medical staff and clinical sections are for a term of one year. (Article II, section 4(1) ; Article IV)

These sections disclose an overall intent to supervise and control the activities of the individual members of the staff who, by accepting the privileges, have agreed to be bound by the by-laws and rules and regulations. If the control is to be meaningful and effective there must be sanctions. The medical staff reserved to itself the right to remove anyone from a previously assigned section in its discretion. The by-laws recommend the trustees confer with the medical staff before cancelling an appointment previously made, which presupposes the right in the trustees to cancel an appointment. Though vague, we believe the by-laws exhibit an intention to provide for the right to cancel the staff privileges of any doctor who does not perform his duties satisfactorily.

It is true, as plaintiff says, there is no provision for a hearing as is included in the dental staff by-laws, but this is not fatal as a set procedure is not required. "The board may, with its own rules or without rules, proceed according to fair and reasonable methods to hold its hearing." Brinkley v. Hassig, 83 F.2d 351, 356. See Brinkley v. Hassig, 130 Kan. 874, 289 P.64. This will be discussed further under the division on due process.

DeHart v. Cotts, 99 Ariz. 350, 409 P.2d 50, cited by plaintiff is not analogous. There the board of chiropractic examiners adopted rules governing professional conduct and ethics. Plaintiffs were threatened with punitive action for violating rules prohibiting advertising. The court held the legislative grant to

the board to make rules for the performance of its duties did not give it the power to make rules for professional conduct. The court did not decide whether adequate standards were set up by the legislature. ·

 III. Plaintiff argues vigorously that he was denied due process of law in several respects during the proceedings which culminated in a hearing before the board of trustees and their decision suspending his staff privileges indefinitely. Authorities are clear that a party subjected to an administrative hearing is entitled to due process. 2 Am. Jur.2d 163, Administrative Law, section 351.

"Due process is not necessarily judicial process, however, and all the formalities of judicial proceedings are not essential to constitute due process of law in an administrative proceeding, even though it is of a quasi-judicial nature. As applied to administrative agencies, due process of law is not a term of fixed and invariable content." Ibid. page 164.

 "Whether the right to practice medicine be classed as a property right, strictly speaking, or as a mere privilege, is not material; for, whichever name be given it, it is a valuable right which cannot be taken away without due process of law, the essential elements of which are notice and opportunity to defend. [Citing cases] But due process does not require that any particular form of proceedings be observed, but only that the same shall be regular proceedings, in which notice is given of the claim asserted and an opportunity to defend against it [citing cases]." Smith v. State Board of Medical Examiners, 140 Iowa 66, 69, 117 N.W. 1116; Elk River Coal & Lbr. Co. v. Funk, 222 Iowa 1222, 1227, 271 N.W. 204, 110 A.L.R. 1415; Gilchrist v. Bierring, 234 Iowa 899, 911, 14 N.W.2d 724; Brinkley v. Hassig, 130 Kan. 874, 289 P. 64; Brinkley v. Hassig, 83 F.2d 351.

"Under general requirements applicable to quasi-judicial proceedings, or under the requirement of a full hearing, a party has the right, and the hearing must afford him the opportunity, to defend the right involved, usually by argument, proof, and cross-examination of witnesses, with knowledge of the evidence, the witnesses to be heard, and the claims and contentions of the opponents, and the trier of facts must reach his decision in

accordance with the facts proved." 2 Am. Jur.2d 227, Administrative Law, section 416.

 A. Here plaintiff directs our attention primarily toward the meeting of the credentials committee on July 13 and the staff meeting on July 26. He contends these proceedings were actually hearings and that his constitutional rights were not respected. It is not argued plaintiff was accorded due process in these proceedings but defendants contend they were investigatory only and no constitutional rights were violated. We agree.

"The cases recognize a distinction between an 'investigation' and a 'hearing' or 'adjudication'. A provision for 'investigation' ordinarily is not the requirement of a 'hearing,' and constitutional rights in adjudicatory proceedings and provisions of statutes and regulations made applicable to 'hearings' may be held inapplicable to investigations. A one-sided investigation does not constitute a hearing.

 "The term 'hearing' is appropriate to quasi-judicial proceedings while 'investigation' is appropriately used with regard to nonjudicial functions of an administrative agency and the seeking of information for future use rather than proceedings in which action is taken against someone. 'Investigation' is nonadversary and contemplates procedure less formal and more flexible than applies even to an administrative hearing. Due process of law does not require that rights normally associated only with adjudicatory proceedings be accorded in a general fact-finding investigation by an agency which does not adjudicate, even assuming that as collateral consequences of the investigation persons who appear as witnesses before it may be subject to public opprobrium and scorn, the likelihood of losing their jobs, and the possibility of criminal prosecutions." 2 Am. Jur.2d 88, 89, Administrative Law, section 257.

The record shows Doctor Singer, chairman of the credentials committee, opened the July 13 meeting with the following statement:

"This evening's meeting is a part of the investigation of the complaint of Sharon Vriezelaar. This investigation is being conducted pursuant to Article VI of the Staff Bylaws because

the complaint involves a charge of ethical misconduct of a member of the staff. Because of the gravity of the charge, this matter was reported to the full staff on July 2, 1965.

"The purposes of tonight's meeting is to afford Dr. Koelling an opportunity to present a personal statement in regard to the complaint made by Mrs. Vriezelaar. In order to familiarize Dr. Koelling with the specifics of the complaint, we had Mr. Tyler deliver to Dr. Koelling's attorney a transcript of Mrs. Vriezelaar's sworn statement and a statement of mine and the exhibits identified in the statements. This was done this morning.

"Following this, Mr. Clayton demanded copies of all statements made in this investigation prior to tonight's meeting. We have not authorized Mr. Tyler to release these additional statements because all witnesses in this investigation have been interviewed independently and not with reference to the written statements of others, and we believe that it is only fair to follow the same procedure here. * * *."

Plaintiff had also received a letter the morning of July 13, stating: "The meeting scheduled for Tuesday, July 13, at 8 p.m., CDST, will be held as scheduled at which time Dr. Koelling is invited to present an oral or written statement in response to the complaint of Mrs. Vriezelaar and is further invited to answer questions by the committee on this matter. Following this Dr. Koelling and his counsel will be furnished with copies of all statements and exhibits that have been assembled in the investigation to date."

The meeting of the medical staff on July 26 was similar to that of the credentials committee.

It is difficult to see how these proceedings could be considered anything other than investigatory. The credentials committee and the medical staff had no authority to act. All they could do was recommend such action as they felt proper under the circumstances to the board of trustees. The proceedings in question here were more closely akin to grand jury proceedings than a judicial hearing. Plaintiff was not compelled to appear, but was invited to answer the complaint made against him. He took advantage of that opportunity and was ably represented by counsel at both proceedings.

The actual hearing before the board of trustees, who had the power to act, was held on the 26th of August, 1965. Plaintiff's counsel was advised by letter dated August 14 and received August 16 of such hearing and eleven specific charges were listed against him.

B. Plaintiff claims he was misled into thinking the inquiry was directed only to the charge of abortion and states he prepared his defense to that charge and was not prepared to defend charges relating to the treatment of the patient and inaccurate information in the hospital records. It is true the main thrust of the presentations at the credentials and staff meetings was directed toward evidence surrounding Mrs. Vriezelaar's charge. However, there was no reason to believe the investigation was limited to this one aspect of the case. At the committee proceedings, following plaintiff's presentation, the doctors present were given an opportunity to ask questions. Doctor Norris said: "This is concerning care, and I think is important to the credentials committee. * * * Why a critical, admittedly critical woman, would be left alone while he went to Colfax. This is concerning her care. This is the thing we also have to consider on the credentials committee."

At the staff meeting, the doctors present asked plaintiff many questions concerning the matters referred to later in the charges against him. For some 15 or 20 pages commencing on page 77 of the record there is a general discussion which indicates the direction the investigation was taking and that the staff was more concerned about the medical care than the charge of abortion. It is also clear counsel for plaintiff understood at this time that the medical care administered to Mrs. Vriezelaar was an issue. Mr. Diehl said:

"Directing ourselves to this question of medical care and again complaining if you please, as to the manner in which this has happened, if that's our yardstick and if that's what we are considering, then we have had no opportunity, notice or opportunity to be heard or to produce evidence in this area at all whatsoever, and it would be a flagrant violation of the doctor's rights, because in that area, as in any other area, he has a right

to be heard and has the right to know what he's being charged with."

As pointed out above these proceedings were investigatory and did not infringe upon plaintiff's constitutional rights. He was fully advised of the charges in the notice which preceded the actual hearing before the board of trustees and was then given the opportunity for a full hearing.

C. Plaintiff claims he was denied the right to confront and cross-examine witnesses against him, which is an essential element of due process. He cites Hanson v. Michigan State Board of Registration, 253 Mich. 601, 236 N.W. 225; 2 Am. Jur.2d 229–234, Administrative Law, sections 418, 419, 424; 70 C.J.S., Physicians and Surgeons, section 18, page 894. At the proceedings before the credentials committee and the medical staff no witnesses were present. At the hearing before the board of trustees, all witnesses whose statements were used were present except Sharon Vriezelaar, Charmain Gibson, Frances Yockey and Veda M. Davenport.

Most of the objections are addressed to the failure to have the witnesses present at the credentials committee and staff proceedings. These are answered by our finding that they were investigatory in nature. The statements of Sharon Vriezelaar and Charmain Gibson dealt only with the accusation of abortion which was not included in the charges presented to the board of trustees and were immaterial at that hearing.

We have been unable to find any statements of Veda M. Davenport. She apparently was not a witness. There is no indication what information plaintiff expected to obtain from her. In all probability it would have been cumulative as was the testimony of Frances Yockey. We do not believe the failure to have these four witnesses present at the hearing before the trustees deprived plaintiff of an opportunity for a full and fair hearing. It is not claimed the board of trustees had the power to issue subpoenas.

"Lack of power to issue process to compel attendance of witnesses does not render proceedings invalid as denying due process of law, nor does due process of law necessarily require that proof be permitted by oral testimony of witnesses actually

1202

present. At least in some circumstances proof by affidavits or by depositions may suffice." 2 Am. Jur.2d 231, Administrative Law, section 419; Missouri ex rel. Hurwitz v. North, 271 U. S. 40, 42, 46 S. Ct. 384, 70 L. Ed. 818, 821.

 D. On July 30, 1965, the active medical staff of the hospital met to consider the final report of the credentials committee which listed eleven separate charges against plaintiff. Neither James Tyler, who conducted the investigation, nor counsel for plaintiff was permitted to attend. Doctor Koelling was present as a member of the active staff and objected to the report. He was given the opportunity to explain his objections which resulted in some questions about his conduct. Plaintiff complains his rights were violated because counsel was not permitted to be present at the deliberations of the staff in arriving at their recommendations. We do not agree plaintiff was entitled to have counsel present at this meeting. Plaintiff was not there as an accused, but as a member of the medical staff. He was not required to be present nor to answer any questions. Counsel had been present at two prior proceedings. At this meeting, the medical staff recommended that the trustees suspend plaintiff's staff privileges indefinitely. His was the only dissenting vote.

E. Plaintiff claims he was denied due process because the functions of judge and prosecutor were improperly combined. The charge is based upon the fact that James Tyler, attorney for the hospital, conducted the investigation, presented the evidence at the various proceedings and was present at the deliberations of the credentials committee when its recommendations to the medical staff were formulated and was also present at the deliberations of the board of trustees when it was determined plaintiff's staff privileges should be suspended indefinitely.

Our holding that the credentials committee proceedings were investigatory eliminates any due process requirements of this nature and Mr. Tyler's presence at such deliberation was not objectionable. We are unable to dispose of the question of his presence at the deliberations of the tribunal before which he had, in effect, served as prosecutor so summarily.

Plaintiff likened the situation to one in which the prosecutor

would be allowed to go to the jury room. The analogy seems apt. Such situation offends the sense of fairness of one who is more familiar with the procedural protection afforded in judicial proceedings. We are however dealing in administrative law in which the functions of prosecutor and judge are frequently combined. Different rules seem to apply. Brinkley v. Hassig, 130 Kan. 874, 289 P. 64; Bryant v. City of Lakeland, 158 Fla. 151, 28 So.2d 106, 109; Smith v. State Board of Medical Examiners, 140 Iowa 66, 69, 117 N.W. 1116.

Neither party has cited cases in which the presence of an attorney for a prosecuting agency at the deliberations of the tribunal has been constitutionally challenged. Plaintiff cites cases in which the same agency has acted as both prosecutor and judge. In Sandahl v. City of Des Moines, 227 Iowa 1310, 290 N.W. 697, we held plaintiff had been denied a fair trial before the civil service commission when that commission had previously conducted an investigation, filed a criminal charge on which no indictment was returned and then filed the charge of neglect of duty before itself. Here Mr. Tyler did not file the charges and was not a member of the board of trustees who heard them. There is a complete record of proceedings here and none in Sandahl. The case seems to be decided under the statutes and does not mention constitutional guarantees.

In Morgan v. United States, 304 U. S. 1, 58 S. Ct. 773, 82 L. Ed. 1129, the United States Supreme Court held plaintiff had not received a fair trial where the Secretary of Agriculture relied on evidence taken by investigating personnel, conferred with them ex parte, accepted their recommendations and issued an order because plaintiff received no notice, was not advised of the government's claims and was given no opportunity to meet the claims. The situation here would have been comparable if the board of trustees had accepted the recommendations of the medical staff without an independent examination of the evidence and if plaintiff had received no notice of the claims and no opportunity to meet them with argument and evidence.

The procedure of an administrative tribunal acting both as prosecutor and judge has never been held to deny constitutional rights. Brinkley v. Hassig, 83 F.2d 351. We have found

1204

no cases in our research which dispute this statement. There is less reason to hold the presence of an attorney who acted as prosecutor, but was a member of neither the prosecuting medical staff nor the board of trustees, the tribunal, to be in and of itself a violation of constitutional rights.

In Marcello v. Bonds, 349 U. S. 302, 75 S. Ct. 757, 99 L. Ed. 1107, it was held petitioner was not denied due process because the hearing officer was under the supervision and control of the officials in the Immigration Service charged with investigative and prosecuting functions.

In Brinkley v. Hassig, supra, it was held that since an administrative tribunal may on its own initiative investigate, file a complaint, and then try a charge so preferred, due process was not denied because one or more members of the administrative body passing upon the revocation of a physician's license aided in the investigation which gave rise to the charges which were the basis of the revocation.

While we cannot approve of Mr. Tyler's presence at the deliberations of the board of trustees, we are unable to find authority which would make this, per se, violative of the due process clause of the constitution in an administrative hearing.

F. Plaintiff urges with considerable vehemence that he was denied due process by the bias and prejudice of the administrative tribunal. We do not believe the record supports such conclusion. The investigative bodies gave plaintiff every opportunity to defend the charge of abortion and explain the reasons for the care and treatment of the patient. The charges against him were set out in full. He received adequate notice of the hearing. His counsel was kept informed and he had a full opportunity to examine and cross-examine all material witnesses.

Plaintiff argues there was a conscious effort to deceive him into thinking the investigation involved nothing but the abortion. We do not agree. As was previously pointed out, questions at the committee proceedings indicated they were looking at medical care as well. Although we frown upon Mr. Tyler's presence at the trustee's deliberations, we are not satisfied this was evidence of bias or prejudice. As attorney for the board his attendance would seem to the board to be normal procedure. Refusal of

the board to deliver many hospital records to plaintiff is no evidence of bias. We point out in the next division that they were not material. We do not consider Mr. Nelson's rulings evidence of bias. The harshness of the decision reflects the opinion of the credentials committee and the whole medical staff. The board of trustees acted only in accordance with the recommendations of plaintiff's fellow physicians. While the effect of the indefinite suspension on plaintiff's practice is obviously severe, we do not think it or the combination of all matters alluded to shows bias and prejudice on the part of the administrative tribunal.

G. Plaintiff claims he was denied due process because the board of trustees refused to deliver hospital records, operating room records, tissue committee records and medical record committee records to his counsel and refused to accept them in evidence. Plaintiff contends these records furnish a standard of care prevailing in the hospital against which to measure plaintiff's alleged deficiencies and were therefore relevant.

The charges against plaintiff were more than deficient, inadequate or erroneous entries. He was charged with intentionally making deceptive and misleading entries. The records would furnish no standard against which to measure such conduct. It would be necessary to establish the intention of the doctor whose entries were in question by outside evidence which certainly would have no place in this hearing. The records themselves were not erroneous on their face, but only in view of the facts which came to light during the investigation. If a particular case was not called to the attention of the records or credentials committee, it could pass unnoticed. If such cases had occurred prior and been called to the proper parties attention it would show up in the minutes of the trustees, staff, credentials or executive committees dealing with ethical complaints, grievances or disciplinary actions. Plaintiff was furnished copies of such minutes for the past five years. No similar instances have been called to our attention.

In connection with the charge of inadequate care, the records would not be particularly helpful as each medical case would depend on its own facts. Such deficiencies, if they existed in

1206

other instances, might never be called to the committees attention. Here, Doctor Koelling's care of this patient might never have come to the attention of the staff if Mrs. Vriezelaar's charge had not precipitated an investigation.

We are of the opinion the hospital records were not material to the proper disposition of this case and therefore need not consider whether they would in fact be privileged.

 IV. Plaintiff claims defendants acted illegally because there was not sufficient competent evidence to support the findings. In certiorari actions "* * * the court should only examine the evidence submitted to determine whether there is any competent and substantial evidence to support the findings." Circle Express Co. v. Iowa State Commerce Commission, 249 Iowa 651, 654, 86 N.W.2d 888. If there is substantial evidence to support the order under review, the courts will not interfere. Home Savings & Trust Co. v. District Court of Polk County, 121 Iowa 1, 11, 95 N.W. 522; Lineberger v. Bagley, 231 Iowa 937, 941, 2 N.W.2d 305. A writ of certiorari will lie where there is no such evidence to support the finding. Des Moines v. Board of Civil Service Commissioners, 227 Iowa 66, 69, 70, 287 N.W. 288; Lineberger v. Bagley, supra. See also City of Iowa City v. White, 253 Iowa 41, 48, 111 N.W.2d 266; Luke v. Civil Service Commission, 225 Iowa 189, 193, 279 N.W. 443.

 The board of trustees found most of the charges against Doctor Koelling were sustained by substantial evidence and placed them in three categories. (1) He intentionally made deceptive and misleading entries on the hospital chart of Mrs. Vriezelaar. (2) He fabricated explanations for his conduct which were not logical, consistent or believable. (3) His care of the patient was seriously inadequate in that he failed to do a pelvic examination, and failed to provide adequate medical supervision for his critical patient when he left her to go to Colfax. These findings are supported by substantial evidence.

Doctor Koelling stated Mrs. Vriezelaar was brought to his office by Mrs. Gibson about 12:45 a.m. in a very weak condition. A hasty examination without removing any clothing disclosed there had been a heavy flow of blood from the vaginal area. He had her admitted to the hospital and did not make a pelvic

examination to determine the source of the bleeding. The patient was not coherent at this time. He ordered blood plasma and blood for the patient. Mrs. Vriezelaar roused enough to inquire about her purse about 3 a.m. He "thought she was referring to a blood type card and she had some kind of reaction". He left the patient in nurses care and went to Colfax to get the purse from her grandparents who had taken it home from the hospital. He did not examine the purse until he returned to the hospital. It did not contain any card of the kind he described. Blood had been administered to the patient during his absence. She was admittedly in a critical condition during this period.

It is difficult to reconcile Doctor Koelling's progress notes with his knowledge of the patient and his care and treatment early June 30. The patient was not capable of giving information at this time but the records, on the surface, appear to have information from her including such statements as "she hadn't had a period for about two months but started flowing very heavily. Thinks all she passed were clots", "she doesn't think she has been pregnant." Plaintiff explains this information came from her friend. However, he had examined her on June 18, including a pelvic examination, and at that time suspected a pregnancy. He stated she talked to him at that time about getting rid of the baby if she was pregnant. He told her to go ahead and have the baby. Although he had this knowledge, there is no indication in the records of June 30 of a suspected miscarriage or abortion.

The physical examination on the hospital form dated June 30, 1965, contains the following notation by Doctor Koelling under "Pelvic Exam."—"No tissue or fragments visible at cervical os." "Cervix shows signs of having been torn rather extensively at delivery of her child." (Eleven months old at the time) This is in direct conflict with his statements that he performed no pelvic examination at that time. He says this information was obtained at the examination on June 18. If so, it had no place in this report. Of course, there would have been no tissue or fragments visible prior to the miscarriage or abortion. This entry was misleading as to the source of her trouble.

With regard to the necessity for a pelvic examination,

Doctor Forsythe testified: "The pelvic examination should be done within the first half hour providing it appears the patient lost blood from the area of the vagina. This patient was fortunate the bleeding stopped. In a number of other cases the hemorrhage would continue and in many cases would have been stopped by removing prehensile tissue from the cervix. An examination should always be made as rapidly as possible. I would estimate that the immediate need for a pelvic examination on this girl was over after she had been in the hospital four or five hours. After that the immediate necessity of a pelvic examination could be delayed. Someway had to be found to stop the bleeding if she was continuing to bleed."

There was reason to be dissatisfied with Doctor Koelling's explanation for his trip to Colfax. His explanation does not disclose any necessity for the trip, particularly since he did not order the nurse to withhold the blood until he could determine if there was a problem. He did not examine the purse in Colfax so the hospital could have been notified of complications by phone, but waited until he returned to the hospital before looking into the purse. He conceded the patient was in critical condition, but left without making arrangements for medical care in his absence. He had not found any doctor in the hospital that evening.

Plaintiff argues that there was a further delay before a pelvic examination was made by Doctor Singer. The difference is explained in Doctor Forsythe's testimony quoted above. He also argues that the patient was left without a doctor for a much longer period after plaintiff had been prevented from seeing her. She was at that time under the care of Doctor Singer, Chief of Staff, and in any event her condition was much improved.

We hold there was substantial evidence to support the findings of the board of trustees.

The action of the trial court in annulling the Writ of Certiorari is therefore affirmed.—Affirmed.

All JUSTICES concur.