# IN THE COURT OF APPEALS OF IOWA

No. 14-1571
Filed August 5, 2015

**MICHAEL TAYLOR,**
    Petitioner-Appellant,

**vs.**

**IOWA DEPARTMENT OF**
**HUMAN SERVICES,**
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Polk County, Eliza Ovrom, Judge.

A father appeals the district court decision affirming the agency action of issuing a founded child abuse report against him and placing him on the child abuse registry. **REVERSED AND REMANDED WITH DIRECTIONS.**

Steven P. DeVolder of The DeVolder Law Firm, Norwalk, for appellant.

Thomas J. Miller, Attorney General, Kathryn K. Lang and Mary K. Wickman, Assistant Attorneys General, for appellee.

Heard by Vogel, P.J., and Potterfield and Mullins, JJ.

**MULLINS, J.**

Michael Taylor appeals from a district court ruling on judicial review affirming the Iowa Department of Human Services's (DHS) classification of a reported incident of child abuse as founded.  Taylor contends the district court erred in concluding (1) the agency's findings were supported by substantial evidence and (2) the agency was not acting irrationally, illogically, unjustifiably, and without authority when it placed Taylor on the abuse registry.  Giving due deference to the agency, we conclude substantial evidence supports its factual finding that Taylor assaulted the child's mother, C.E.  On the child abuse issue, however, we conclude the agency's application of law to the facts was "irrational, illogical, or wholly unjustifiable" when it failed to apply the proper law and administrative rule.  We therefore reverse the decision that Taylor should be placed on the registry based on a finding that he committed child abuse by denying critical care and remand to the district court to enter an order reversing and remanding to the agency for further determinations consistent with this opinion.

I.      **BACKGROUNDS FACTS AND PROCEEDINGS.**

The following evidence was presented at the administrative hearing on this matter:

C.E. testified she has two children, A.T. and G.T.  Their father is Michael Taylor.  C.E. and Taylor lived together off-and-on between 2003 and 2012.  There was no formal custody order regarding the children or order of child support.  C.E. testified that in May 2013, Taylor was not living with her but came

over a few times a week to stay with the children while she worked a night shift. Taylor came over at about 4:00 p.m. on May 9.  C.E. was in the home with G.T., who was then two-and-a-half years old.  A.T. was at C.E.'s mother's house. C.E., Taylor, and G.T. were in the first-floor living room area, adjacent to the kitchen.

C.E. and Taylor started arguing about money.  C.E. testified Taylor was raising his voice and getting agitated.  She asked him to leave repeatedly, and he refused.  C.E. was sitting in a recliner chair.  She picked up her cellular telephone from an end table.  C.E. testified Taylor took the phone from her hand and threw it away from her, but the record is unclear as to where he threw it or with what force.  Then, Taylor pulled C.E. out of the recliner and dragged her toward the entryway of the kitchen.  She testified she was on the floor with Taylor behind her, with Taylor holding her so she could not move.  He had one arm wrapped around her neck and the other arm pressed tightly against her jaw and mouth. C.E. testified G.T. was standing close by, in front of the doorway to the kitchen and that he started crying and screaming, "Mama and Daddy."  C.E. testified Taylor said to her, "If you make a sound, I will snap your neck."

C.E. stated Taylor then released her, and she sat back on the recliner. G.T. walked to stand in front of her on the recliner, and she attempted to calm him down by saying, "No, it's okay.  We were just playing."  G.T. calmed down and went back to playing with his toys.  C.E. testified the attack happened quickly and she did not know where G.T. was when Taylor pulled her out of the recliner but knew he was somewhere in the room.  After the incident, A.T. came home

from visiting C.E.'s mother. C.E. left the residence with A.T. and went to her mother's home, leaving G.T. in Taylor's care. C.E. testified that after she left the house, Taylor called her repeatedly, about every half hour. She spoke with G.T. a couple times during these calls. C.E.'s mother encouraged her to make a police report. At about 9:00 p.m., C.E. went to the police station and filed a report. However, no charges were filed. The police officer did not identify any physical injuries on C.E. She told the police officer she had a cut on the inside of her mouth, but he did not examine it. After she made her report, a law enforcement officer accompanied C.E. back to the home and asked Taylor to vacate the home.

C.E. testified she went to the courthouse the next day to request a no-contact order but was unable to do so because she arrived too late in the day and the judge was about to leave. She intended to go back the following Monday but testified she was too scared to follow through. She did later obtain a no-contact order in July 2013. The no-contact order did not include the children. In July or August 2013, C.E. filed an action against Taylor for a custody order seeking primary physical care of the children and child support. That action was ongoing at the time of the administrative hearing.

After C.E. made the May 2013 police report, the police department notified DHS that a child was involved, and DHS opened an investigation. A social worker visited the home and interviewed C.E. The worker filed a child abuse report concluding the allegation of child abuse, based on a failure to provide adequate supervision, was founded and listed Taylor as the perpetrator. Taylor

told the social worker the incident did not happen but refused to be interviewed for the report.

At the administrative hearing, the social worker testified that children suffer emotional harm when they see domestic violence and that this often remains with them as they get older. She also testified the closer the physical proximity of the child to the incident, the greater the chance of emotional and also physical harm. Further, younger children who are less mobile or unable to protect themselves are more vulnerable to emotional and physical harm. She testified G.T. was too young to protect himself in the situation.

Taylor also testified at the administrative hearing. He testified that at the time of the incident, he was living in the home with C.E. and the children. He stated that on the afternoon of May 9 he and C.E. had a verbal argument. A.T. returned home at that time. C.E. then left to run errands, taking A.T. with her. Taylor testified he remained at home with G.T. for several hours. Then, when C.E. came back three-and-a-half to four hours later, there was a police officer escorting her. He testified the police officer informed him C.E. felt unsafe and wanted him to leave. Taylor said, "That's fine." He packed a few personal items and left.

Police Detective David Baylock also testified on behalf of Taylor. He testified that it is state law and police department policy that in domestic violence situations, the aggressor is arrested if there is "probable cause." He defined "probable cause" as "reasonable suspicion that I believe a criminal activity is afoot." On cross-examination, the officer stated that even in domestic violence

cases where no charges are filed, if children are involved, the report is sent to DHS because there may still be child protective issues. He agreed that he was not involved in either the criminal or the child protective aspects of this case.

The administrative law judge (ALJ) found Taylor had assaulted C.E. consistent with her testimony. The ALJ specifically found C.E. was credible, and Taylor was not credible. The ALJ further found, by a preponderance of the evidence, that Taylor's conduct constituted child abuse. The ALJ's proposed decision concluded Taylor should be placed on the central child abuse registry due to Taylor having had one prior founded child abuse assessment. Taylor filed for judicial review. The district court found substantial evidence supported the agency's factual conclusions and affirmed the report and Taylor's placement on the child abuse registry. Taylor appeals.

## II. STANDARD AND SCOPE OF REVIEW.

We apply the standards of judicial review set forth in the Iowa Administrative Procedure Act, Iowa Code chapter 17A, in our review of the agency's findings concerning child abuse reports. *See* Iowa Code § 235A.19(3); *Mauk v. Iowa Dep't Human Servs.*, 617 N.W.2d 909, 911 (Iowa 2000). We review the district court's decision to see if we reach the same conclusions. *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 255-56 (Iowa 2012).

When the claimed error lies with the agency's findings of fact, we ask whether substantial evidence supports those findings when the record is viewed as a whole. *Meyer v. IBP, Inc.*, 710 N.W.2d 213, 218 (Iowa 2006). Substantial evidence is defined statutorily as:

the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

Iowa Code § 17A.19(10)(f)(1).  Where the evidence is in conflict or where reasonable minds might disagree about the conclusion to be drawn from the evidence, the court must give appropriate deference to the agency's findings. *Freeland v. Emp't Appeal Bd.*, 492 N.W.2d 193, 197 (Iowa 1992).  It is the agency's duty as the trier of fact, not the reviewing court, to determine the credibility of witnesses, to weigh the evidence, and to decide the facts in issue. *Arndt v. City of LeClaire*, 728 N.W.2d 389, 394-95 (Iowa 2007).

[C]ourts should broadly and liberally apply those findings to uphold rather than to defeat the agency's decision.  Evidence is not insubstantial merely because it would have supported contrary inferences.  It is substantial when a reasonable mind could accept it as adequate to reach the same findings.  The determining factor is not whether the evidence supports a different finding but whether the evidence supports the finding actually made.

*IBP, Inc. v. Al-Gharib*, 604 N.W.2d 621, 632 (Iowa 2000) (internal citations omitted).  We give significant deference to the ALJ's findings of credibility.  *Lange v. Iowa Dep't of Revenue*, 710 N.W.2d 242, 247 (Iowa 2006).

In order to determine whether Taylor's conduct constituted child abuse and whether he should be placed on the registry, DHS was required to apply the law to the facts.  "An agency's application of law to the facts can only be reversed if we determine such an application was 'irrational, illogical, or wholly unjustifiable.'"  *Mycogen Seeds v. Sands*, 686 N.W.2d 457, 465 (Iowa 2004) (quoting Iowa Code § 17A.19(10)(m)).  We give "appropriate deference to the

view of the agency with respect to particular matters that have been vested by a provision of law in the discretion of the agency." Iowa Code § 17A.19(11)(c).

## III. ANALYSIS.

### A. Taylor's Assault on C.E.

Taylor contends the district court erred in finding he assaulted C.E. because there was no evidence except the testimony of C.E. He argues C.E. was inconsistent in her version of events to DHS, to law enforcement, and at the administrative hearing. He also complains there were no physical marks on C.E., and the police officer did not file charges against him.[1] He challenges C.E.'s credibility by pointing out she left G.T. at home with him after the incident and did not request a no-contact order until July 2013.

The ALJ made specific credibility findings and set out the factors considered including "whether the person's statements are reasonable; whether the individual provides consistent statements over time; whether the person appears credible to the listener; whether the person is competent in terms of age, memory, and knowledge; and whether the person has a motive or bias." The ALJ made the following findings regarding C.E.:

> I find that her testimony at the time of hearing was consistent with previous statements made to both the Des Moines Police Department and to [DHS] regarding this incident. Her responses to the questions asked during direct testimony and cross-examination were consistent, forthcoming and reasonable. Counsel for Taylor highlighted different language used in the police report versus [DHS's] to describe the allegation of assault. I find the differences

---

[1] Taylor also complains that C.E. testified at the hearing by phone and deprived the ALJ and counsel of the opportunity to assess her credibility. Taylor did not raise this issue before the ALJ; therefore, it is not preserved for our review. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

contained in the two reports to be insignificant. It has no bearing on [C.E.'s] credibility as a witness.

The ALJ also made the following findings regarding Taylor:

Taylor testified in person at the hearing. I could not assess whether Taylor's statements at the hearing were consistent with previous ones, because Taylor declined to be interviewed by [DHS]. However, I did carefully evaluate Taylor's testimony given at hearing. I did not find it reasonable or credible. He claims that he was not aware of [C.E.'s] allegations of assault until several days after the incident. Taylor testified that when [C.E.] returned with a police officer that evening, he never made inquiry regarding why the police officer instructed him to pack his things and vacate the residence. Taylor insists that he lived in the residence with [C.E.] at the time of the incident. He also denies that any physical altercation occurred on that date. Therefore, his assertion that he never once asked why a police officer appeared without warning at his home and requested that he leave is simply not believable. Taylor claimed he did not ask questions of the officer because [C.E.] had been increasingly hostile and explosive in front of the children, something to which he was "documenting." Taylor did not further elaborate on these assertions, which I found to be evasive and unreasonable.

We defer to the credibility determinations of the ALJ. *See Arndt*, 728 N.W.2d at 395-96; *Lange*, 710 N.W.2d at 247. C.E. testified she and Taylor were arguing, that Taylor grabbed her cellular phone from her hand, then forcibly pulled her from her chair and forced her to the floor. He wrapped one arm around her neck and pressed another against her jaw and mouth. He gripped her tight enough that she could not move. Taylor suggests that credible witness testimony requires corroboration. It does not. *See Claus v. Whyle*, 526 N.W.2d 519, 524 (Iowa 1994) (finding the plaintiff's credible testimony was substantial evidence to support the court's finding of sexual abuse); *see also* Iowa R. Crim. P. 2.21(3) ("Corroboration of the testimony of victims shall not be required."); *State v. Hildreth*, 582 N.W.2d 167, 170 (Iowa 1998); *State v. Knox*, 536 N.W.2d 735, 742

(Iowa 1995). The lack of a physical injury does not mean a physical assault did not occur; physical assaults do not always result in a visible injury. *See Hildreth*, 582 N.W.2d at 170. The law enforcement officer's determination not to file charges likewise does not undermine the credibility of C.E.'s testimony about the assault. The question is whether the record supports the ALJ's findings. Upon examining the record as a whole, we conclude the ALJ's finding that Taylor assaulted C.E. is supported by substantial evidence.

### B. Denial of Critical Care.

After finding Taylor committed domestic abuse against C.E. in the presence of G.T., DHS determined that the domestic abuse constituted child abuse by denial of critical care as a result of failing to provide adequate supervision of G.T. Taylor contends there was not substantial evidence supporting this conclusion. He argues that DHS's "conclusion of denial of critical care is not supported by any facts," and that it's "conclusion is not supported factually or even logically." He also argues that DHS acted irrationally, illogically, wholly unjustifiably, and without authority when it placed him on the registry.

At the ALJ hearing, C.E. testified that G.T. was present when Taylor assaulted her, that G.T. began crying and screaming, "Mama and Daddy," that G.T. went to her immediately after the assault while she was sitting in the recliner, and that she had to calm him down. She also testified she was concerned because G.T. was playing in the living room and she was not aware of exactly where he was when Taylor began assaulting her. She then saw him standing in front of the kitchen doorway and crying.

The social worker who investigated the claim testified generally that children suffer lasting emotional harm when they see domestic violence. She also testified there is a risk of physical harm to young children if they are present during an episode of domestic violence because they lack mobility and are unable to protect themselves when the attack is physically close to them.

After finding by a preponderance of the evidence that Taylor physically assaulted C.E. in front of G.T., the ALJ concluded:

> Witnessing a physical assault take place against a parent can have a profound negative emotional impact on a young child. Further, G.T. could have been physically injured by his close proximity to the physical struggle in which his parents were engaged. Therefore, by physically assaulting [C.E.] in front of G.T., Taylor failed to exercise the type of supervision that a reasonable and prudent person would exercise under similar circumstances. I find that Taylor's conduct on May 9, 2013, constituted child abuse by failure to provide proper supervision.

The ALJ then concluded the mandatory criteria were met to place Taylor's name on the central abuse registry.

The DHS final decision relied on the ALJ's conclusions and reasoned:

> Witnessing physical assault take place against a parent can have a profound negative emotional impact on a young child. Further, the child could have been physically injured by his close proximity to the physical struggle in which his parent were engaged. There is no requirement that the child actually be harmed to be considered child abuse. The child was in danger of being harmed.

On May 9, 2013, the day of the domestic assault, the relevant part of the definition of "child abuse" included:

> (4)(a) The failure on the part of a person responsible for the care of a child to provide for the adequate food, shelter, clothing, medical or mental health treatment, supervision, or other care necessary for the child's health and welfare when financially able to do so or when offered financial or other reasonable means to do so.

(b) For the purposes of subparagraph division (a), failure to provide for the adequate supervision of a child means the person failed to provide proper supervision of a child that a reasonable and prudent person would exercise under similar facts and circumstances and the failure resulted in direct harm or created a risk of harm to the child.

Iowa Code § 232.68(2)(a)(4)(a), (b) (2013) (adopted in 2011 Iowa Acts ch. 28, § 1). Iowa Administrative Code rule 441-175.21 identifies the DHS interpretation of this code subsection as "denial of critical care." *See Doe v. Iowa Dep't of Human Servs.*, 786 N.W. 2d 853, 855 (Iowa 2010). The part of the administrative rule applicable to this case at the time of the domestic abuse is the following:

> *"Denial of critical care"* means the failure on the part of a person responsible for the care of a child to provide for the adequate food, shelter, clothing, medical or mental health treatment, supervision or other care necessary for the child's health and welfare when financially able to do so, or when offered financial or other reasonable means to do so, and shall mean any of the following:
> . . . .
> 7. Failure to provide for the adequate supervision of the child that a reasonable and prudent person would provide under similar facts and circumstances when the failure results in direct harm or creates a risk of harm to the child.

Iowa Admin. Code r. 441-175.21 (effective Sept. 7, 2011) (intended to implement 2011 Iowa Acts ch. 28, § 1 per 33 Iowa Admin. Bull., no. 26, at 1718-20 (June 29, 2011)).

Among the conclusions of law recited in the ALJ's proposed decision are these:

> Child abuse is defined to include the failure on the part of a person responsible for the care of a child to provide for the adequate food, shelter, clothing or other care necessary for the child's health and welfare. The department's rules define "adequate food, shelter, clothing or other care" as "food, shelter, clothing or other care which, if not provided, would constitute a denial of critical care."

Denial of critical care includes, "failure to provide for the proper supervision of the child to the extent that there is *danger of the child suffering injury or death*, and which a reasonable and prudent person would exercise under similar facts and circumstances." Proper supervision is defined as "supervision which a reasonable and prudent person would exercise under similar facts and circumstances."

(Emphasis added.) Footnotes in the ALJ's proposed decision cited to Iowa Code sections 232.68(d) and 232.68(2)(a)(4)(a) and Iowa Administrative Code rule 441-175.21.

The definitions of "child abuse" and "denial of critical care" recited by the ALJ, and adopted in the DHS final decision were not the statutory or administrative law in effect at the time of the domestic abuse in this case. The language used by the ALJ and DHS are paraphrases of the outdated language: "danger of the child suffering injury." The outdated language was applicable until the 2011 legislative session adopted the statute quoted earlier in this division of this opinion and until the administrative rule was amended to correspond to the legislative change. These changes were applicable on May 9, 2013.[2] Words matter. The legislature thought so or it would not have amended the statute; and DHS thought so or it would not have amended the rule.

---

[2] Taylor's brief cites to the rule upon which DHS relied in its decision, and thus his argument is couched in terms of outdated law rather than the current statutory or rule terms. The State's brief argues current law, points out that Taylor relies on outdated law, but makes no mention of the fact that DHS also ruled using outdated law. Taylor's reply brief cites the current statute but fails to address the differences between current law and the law he cited in his appellant's brief. The district court cites the current law, makes no reference to the outdated law cited by DHS, but finds substantial evidence in support of DHS under the current law.

In order to find Taylor committed child abuse and to place Taylor on the registry, the facts must support the legal conclusion that his assault of C.E. constituted a failure to supervise G.T., which "resulted in direct harm or created a risk of harm to the child," not "that there is a danger of the child suffering injury." For purposes of this appeal, we observe that the conclusions of both the ALJ and DHS appear to be a mix of findings of fact and legal conclusions, and that neither the ALJ nor DHS used the terms "direct harm" or "risk of harm" in their decisions. The statute contains those terms, and DHS followed the statutory language in adopting administrative rule 441-175.21(7). Because it used the outdated terminology in its recitation of the applicable law and did not use the correct terminology in its analysis, we cannot say with confidence DHS applied the proper law to the facts in this case.

Although we determine the agency has been vested by a provision of law with the discretion to apply the law to the facts in this child abuse registry case, "we make an independent determination of the meaning of pertinent statutes." *Midwest Automotive v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 422 (Iowa 2002). The legislature has not defined the terms "direct harm" or "risk of harm."

In a prior child abuse registry case interpreting Iowa Code section 232.71D, our supreme court explained:

> The purpose of statutory interpretation is to determine the legislature's intent. *State v. McCoy*, 618 N.W.2d 324, 325 (Iowa 2000). We give words their ordinary and common meaning by considering the context within which they are used, absent a statutory definition or an established meaning in the law. *Midwest Auto. III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 426 (Iowa 2002). We also consider the legislative history of a statute, including prior enactments, when ascertaining legislative intent.

> *State v. Allen*, 708 N.W.2d 361, 366 (Iowa 2006). When we interpret a statute, we assess the statute in its entirety, not just isolated words or phrases. *Rojas v. Pine Ridge Farms, L.L.C.*, 779 N.W.2d 223, 231 (Iowa 2010). We may not extend, enlarge, or otherwise change the meaning of a statute under the guise of construction. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004).

*Doe*, 786 N.W. 2d at 858*.*

Thus, in order to put context to the terms "direct harm" and "risk of harm" we will examine the entirety of Iowa Code section 232.68(2)(a) defining what conduct or other factors constitute "child abuse" or "abuse." The first definition states: "Any nonaccidental physical injury, or injury which is at variance with the history given of it, suffered by a child as the result of the acts or omissions of a person responsible for the care of the child." Iowa Code § 232.68(2)(a)(1). This provision requires a nonaccidental physical injury or an injury—presumably a physical injury—at variance with the given history, resulting from acts or omissions. The second definition requires a "mental injury to a child's intellectual or psychological capacity" requiring observable evidence and substantial impairment of function and diagnosis by a licensed physician or qualified mental health professional. *Id.* § 232.68(2)(a)(2). The third definition requires commission of a sexual offense with or to a child. *Id.* § 232.68(2)(a)(3). The fourth is the subject of this opinion, and requires failure to make certain provisions for the care of a child as set forth verbatim earlier in this opinion. *Id.* § 232.68(2)(a)(4). The fifth relates to child prostitution. *Id.* § 232.68(2)(a)(5). The sixth definition requires presence of an illegal drug in the child's body. *Id.* § 232.68(2)(a)(6). The seventh involves the manufacture of certain illegal drugs.

*Id.* § 232.68(2)(a)(7). The eighth requires commission of bestiality in the presence of a minor. *Id.* § 232.68(2)(a)(8). Number nine involves access to a registered sex offender. *Id.* § 232.68(2)(a)(9). And the tenth and last definition involves access to obscene material. *Id.* § 232.68(2)(a)(10).

With the exception of section 232.68(2)(a)(4), all other subparagraphs specifically identify the harm or exposure to which a child must be subjected in order to satisfy the definition of "child abuse" or "abuse": physical injury, mental injury, sexual offense, prostitution, illegal drugs in the body, manufacture of illegal drugs, bestiality, access to sex offender, and obscene materials. Subsection (2)(a)(4)(a), however, is based solely on failure to provide specified items necessary to the well-being of a child. Subparagraph division (b) of (2)(a)(4) contains an additional requirement if the allegation is "failure to provide for the adequate supervision of a child." The legislature does not define a failure to supervise a child as an adult's assaultive behavior witnessed by a child. It requires that "the person failed to provide proper supervision of a child that a reasonable and prudent person would exercise under similar facts and circumstances *and the failure resulted in direct harm or created a risk of harm to the child.*" *Id.* § 232.68(2)(a)(4)(b) (emphasis added).

So, we conclude "risk of harm" requires a finding of risk of actual injury or damage caused by or closely related to the alleged failure to provide proper supervision. What then did the legislature intend for "risk" to mean in section 232.68(2)(a)(4)(b)? Within the context of the other enumerated factors, we

conclude "risk" means the facts present more than just a theoretical possibility of harm: there must be a real possibility of harm.

The ALJ and the district court both cited the possibility of a "negative emotional impact" on G.T. as a result of witnessing the assault. Here, the State also argues that G.T. was at risk for emotional harm. In *In re J.S.*, our supreme court determined that "harmful effects" could include mental harm. 846 N.W.2d 36, 41-42 (Iowa 2014). Iowa Code section 232.68(2)(a)(2) provides the definition of "child abuse" or "abuse" includes:

> [a]ny mental injury to a child's intellectual or psychological capacity as evidenced by an observable and substantial impairment in the child's ability to function within the child's normal range of performance and behavior as the result of the acts or omissions of a person responsible for the care of the child, if the impairment is diagnosed and confirmed by a licensed physician or qualified mental health professional as defined in section 622.10.

That section reveals a clear intention by the legislature that a finding of child abuse based on a mental injury to a child's intellectual or psychological capacity may be proven if diagnosed and confirmed by a physician or mental health professional. The requirements for a determination of mental injury do not include emotional harm or "negative emotional impact" unless the harm rises to the level of a mental injury under the strictures of that subparagraph. No definition of "child abuse" or "abuse" in section 232.68(2)(a) includes the terms emotional harm, risk of emotional harm, or negative emotional impact. In addition, the findings of DHS do not distinguish between a theoretical risk and a real possibility of harm under the facts of this case. As we have determined that these are not terms used by the legislature, and the agency found a "negative

emotional impact" without having applied the proper statutory or rule language, we need not attempt to define them at this stage of the proceedings.

To summarize, the conclusions drawn by the ALJ, and adopted as the final DHS decision, utilized the wrong statutory test and made a determination of theoretical harm. DHS applied the wrong statutory language and administrative rule when it found Taylor's conduct constituted child abuse for registry purposes. It failed to properly apply the law to the facts of this case. Therefore, we conclude the DHS decision was based upon an irrational, illogical, or wholly unjustifiable application of law to fact. Accordingly, this issue must be reversed and remanded for application of the law and rule in effect at the time of the domestic abuse to the facts of record. On remand, DHS must determine whether the specific facts of this case satisfy the legislature's words, "direct harm or risk of harm."

## IV.    CONCLUSION.

Giving proper deference to the agency's credibility determinations, substantial evidence supports the agency's factual findings that Taylor assaulted C.E., and we affirm that part of the decision by the district court. However, we find the agency applied outdated versions of the relevant code and administrative rule to conclude Taylor committed child abuse by denial of critical care. Accordingly, the agency decision was based on an irrational, illogical, or wholly unjustifiable application of law to fact. We reverse the district court decision affirming the finding of denial of critical care and placement on the child abuse registry and remand to the district court for it to enter an order reversing and

remanding the case to the agency for further determinations consistent with this opinion.

**REVERSED AND REMANDED.**