# IN THE COURT OF APPEALS OF IOWA

No. 15-1862
Filed November 9, 2016

**BRIAN SYDNES,**
Petitioner-Appellant,

**vs.**

**IOWA DEPARTMENT OF HUMAN SERVICES,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Karen A. Romano, Judge.

A father appeals a founded assessment of child abuse by mental injury by the Department of Human Services and his placement on the central registry. **AFFIRMED.**

Tammy M. Westhoff Gentry of Parrish, Kruidenier, Dunn, Boles, Gribble Gentry, Brown & Bergmann, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and David Van Compernolle and Teresa M. Baustian, Assistant Attorneys General, for appellee.

Heard by Vogel, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

Brian Sydnes appeals the district court's ruling on judicial review upholding the Iowa Department of Human Services (DHS) founded assessment of child abuse by mental injury involving his daughter, J.S., and his placement on the central registry. He raises three claims: (1) the DHS violated his right to due process, (2) the DHS ruling is not supported by substantial evidence, and (3) the DHS gave "undue credence" to the prior child-in-need-of-assistance (CINA) adjudication.

Like the district court, we reject all three challenges to the DHS actions. First, although the DHS did not provide Brian with statutory notice in a timely manner, this failure did not rise to the level of a constitutional violation because Brian received actual notice he was the target of the DHS investigation in time to provide a meaningful response. Second, substantial evidence supports the DHS ruling. Third, because our legislature has determined a CINA adjudication "may be determinative" in a contested case proceeding, the DHS gave the adjudication proper deference and weight.

## I. Facts and Prior Proceedings

The child at issue in this case is J.S., the teenage daughter of Brian and O.S. J.S. and her two younger siblings experienced emotional distress related to the contentious divorce of their parents. The most serious manifestation of that distress occurred in July 2013, when J.S. attempted suicide by taking an overdose of ibuprofen. She was admitted to the adolescent psychiatric unit at the University of Iowa Hospitals. Her treating physician, Dr. Eric Boyum, contacted the DHS and alleged a mental injury to J.S. caused by both parents.

After an investigation by child protection worker (CPW) Theresa Hirst, the DHS initial assessment, issued on August 9, 2013, determined the allegations of "mental injury" were unfounded. But after receiving Dr. Boyum's written report, the DHS issued a founded assessment as to both parents in an August 16 "mental injury" addendum. The DHS offered services to the family. In early November 2013, the DHS asked the county attorney to file a CINA petition alleging negative behavior by Brian and O.S. and expressed "concerns about whether [J.S.'s] emotional needs are being met in either parent's home."

On November 25, 2013, the county attorney filed a CINA petition. The juvenile court held a contested hearing, and its February 28, 2014 ruling noted the guardian ad litem and J.S. herself favored the CINA adjudication. The only party contesting the determination was Brian. The court noted Brian was "concerned how this ruling may affect his ability to obtain future employment with government contracts." The court adjudicated J.S. as CINA under Iowa Code section 232.2(6)(c)(2) (2013) (regarding parent's failure to supervise). The court found, based on clear and convincing evidence, J.S. had suffered emotional distress and was likely to suffer additional harm due to the argumentative and unhealthy relationship between her parents. The court ordered J.S. to be placed in foster care.

Brian filed a motion under Iowa Rule of Civil Procedure 1.904(2). On June 10, 2014, the court reaffirmed its ruling on Brian's failure to supervise and made an additional finding relevant to this appeal—based on the evidence presented at the hearing, the State had proven by clear and convincing evidence

the parents' behavior led to adjudication of J.S. as CINA under section 232.2(6)(c)(1) (mental injury caused by the acts of the child's parents).

Brian appealed the CINA adjudication to this court, alleging he was "being blamed for the mother's infliction of mental injury" on J.S. *See In re J.S.*, No. 14-1014, 2014 WL 4938012, at *2 (Iowa Ct. App. Oct. 1, 2014). Upholding the juvenile court's ruling, we noted Brian's focus was misdirected because the question was not which parent was "more blameworthy" but whether continued DHS supervision was necessary to ensure the psychological harm to J.S. did not worsen.[1] *Id.*

Meanwhile, Brian challenged the founded assessment and his placement on the central registry—the basis for this appeal. A contested hearing before an administrative law judge (ALJ) occurred on October 7, 2014.[2] Two months later, on December 5, the ALJ issued his proposed decision. The ALJ sustained the founded child abuse assessment and Brian's placement on the central abuse registry under Iowa Code section 232.71D. Brian appealed, and the DHS director's December 24 final decision adopted the ALJ's proposed decision, stating: "A reasonable and prudent person would not put their own conflicts with another adult before the medical needs of their own child."

---

[1] Noting the parents' emotional battle was not new, this court observed:
> An Iowa DHS social worker testified, "All three kids expressed to the Department that the relationship between the parents is very contentious and conflictual and that's causing them emotional distress." The worker explained the mother lacks boundaries as to the information she shares with the children about her critical feelings toward the father and their ongoing custody issues. The father, while less blatant, also communicates his negative feelings toward the mother to others, and the children are aware of those communications. The children are hesitant to talk to the DHS workers while in the company of their father.

[2] An earlier hearing date was continued at Brian's request.

Brian sought judicial review, and after hearing arguments, the district court affirmed the agency on October 13, 2015.  Brian now appeals.

## II.  Scope and Standards of Review

The DHS is vested with discretion in the area of child abuse and placement of those who perpetrate abuse on the offender registry.  *See Grant v. Iowa Dep't of Human Servs.*, 722 N.W.2d 169, 177 (Iowa 2006).  "We apply the standards of judicial review set forth in the Iowa Administrative Procedure Act, Iowa Code chapter 17A, in our review of the agency's findings concerning child abuse reports."  *Taylor v. Iowa Dep't of Human Servs.*, 870 N.W.2d 262, 266 (Iowa Ct. App. 2015).  "We review the district court's decision to see if we reach the same conclusions."  *Id.*

On judicial review, we are bound by the agency's findings of fact "if supported by substantial evidence in the record as a whole."  *Meyer v. IBP, Inc.*, 710 N.W.2d 213, 218 (Iowa 2006).  "In our fairly intensive review," we consider "evidence supporting the challenged finding as well as evidence detracting from it."  *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 525 (Iowa 2012).  But "courts should broadly and liberally apply" the agency's findings of fact "to uphold rather than defeat the agency's decision."  *Taylor*, 870 N.W.2d at 266 (citation omitted) ("It is the agency's duty as the trier of fact, not the reviewing court, to determine the credibility of the witnesses, to weigh the evidence, and to decide the facts in issue.").  Record evidence "is not insubstantial merely because it would have supported contrary inferences."  *Id.* (citation omitted).

Our review of agency action involving constitutional issues is de novo. *Chiodo v. Section 43.23 Panel*, 846 N.W.2d 845, 848 (Iowa 2014).

### III. Due Process

Brian contends the district court erred in upholding the DHS determination because he was not afforded procedural due process. Brian faults the DHS for failing to provide a timely notification letter as required by statute. He asks us to reverse the district court and vacate the founded child abuse assessment against him.

Brian is entitled to procedural due process in this administrative proceeding. *See Koelling v. Bd. of Trs.*, 146 N.W.2d 284, 291 (Iowa 1966). But "all the formalities of judicial proceedings are not essential to constitute due process of law in an administrative proceeding." *Id.* In the context of administrative agencies, "due process of law is not a term of fixed and invariable content." *Id.* We agree with Brian's formulation of his right to due process—he must be provided "notice of the allegations against him in time to provide a meaningful opportunity to respond."

We turn to the assessment process utilized here. *See* Iowa Code § 232.71B(1)(a) (requiring the DHS to promptly commence an assessment if it finds a report is an allegation of child abuse). The DHS, "within five working days of commencing the assessment, shall provide written notification of the assessment to the child's parents." *Id.* § 232.71B(2). "If a parent is alleged to have committed the child abuse, the notice shall inform the parents regarding the complaint or allegation made regarding the parent." *Id.*

UI Hospitals admitted J.S. on July 5, 2013. According to Brian, he then called the DHS hotline and reported his daughter's suicide attempt, the emotional harm inflicted on J.S. by O.S., the physical fighting between O.S. and J.S., and

O.S.'s defiance of the court orders. Brian stated the DHS did not accept his report, finding his allegations did not "rise to the level of neglect or abuse necessary for assessment."

The assessment at issue commenced on July 12, 2013, when the DHS accepted a referral alleging "the mother [O.S.] and father [Brian] have caused a mental injury to the child [J.S.] by the manner in which they have treated and spoken to the child. Child is currently a patient at U of I Hospitals."

On July 15, CPW Hirst spoke to the hospital social worker and learned J.S., upon admission, was "in a state of depression, anxious, restless, somewhat oppositional, [and] regretful that her overdose wasn't successful in killing her." The social worker expressed concerns about both parents, telling Hirst each noted the other's behavior as the cause of J.S.'s suicidal thoughts.

A different child protection worker interviewed J.S. on July 16; the child's condition had improved and she was agreeable to being discharged to her mother's care but did not want to go to her father's home. J.S. told the worker that in March, when her father was mad about the amount of time she spent on her iPod, he grabbed her by her arm, "drug her up the stairs," and later smashed the device with a hammer. J.S. ran away to a friend's house and later that evening went to her mother's home. J.S. stated she did not live with Brian after the March 2013 incident.

Four days after the assessment commenced, on July 16, Hirst called Brian and left a message asking him to call her about "an open child abuse assessment." Brian did not return her call. On July 17, Hirst noted "historically,

any communication the father has had with the [DHS] has been through email." Hirst planned to make further "attempts to interview the child's father."

The hospital called Brian on July 18 to inform him J.S. was being released to her mother. On July 23, Hirst spoke to J.S. for the first time. J.S. said her father tries to communicate with her but "she just doesn't want to talk to him." On July 24, Hirst noted she still had not received any response from Brian.

Hirst was able to speak with Dr. Boyum by phone on July 29. Dr. Boyum stated his belief that "both parents are causing mental injury" to J.S. and agreed to send Hirst a letter stating this opinion. Also on July 29, Hirst sent Brian a letter again informing him of the open assessment regarding J.S. and requesting Brian call Hirst to discuss the assessment and "any concerns you may have." Neither Hirst's initial phone message nor this letter informed Brian the assessment included allegations against him.

Brian drafted a lengthy letter on August 2, stating he was concerned about the safety of J.S. and the two younger children, "especially in the care of their mother." He stated the hospital personnel had attempted to intimidate him by saying "they were going to report to DHS emotional injury against both parents." Brian concluded by stating he had retained an attorney to help him reinstate supervised visitation with the mother because, otherwise, he feared the mother's "emotional and psychological abuse" of the children would only worsen. The DHS included the entirety of Brian's letter in its assessment.

On August 4, 2013, Hirst sent another letter to Brian, provided him with two phone numbers, and stated:

> I have received your letter on August 2, 2013, regarding your concerns of the mental health status of [O.S.]. I need to further speak with you regarding how your actions and behaviors [m]ay have negatively impacted [J.S.], as the concerns received by DHS allege[ ] that *both yourself and* [O.S.] . . . have caused mental injury to [J.S.].
> I would like to schedule an appointment and meet with you to further discuss and assess the information that I have gathered thus far during the course of my assessment to gather additional information, clarification, and to provide you an opportunity to respond to the concerns as it involves yourself and your family.

Thus, Brian learned on August 4 that the DHS assessment included allegations against him. This actual notice was more than five days after the assessment commenced on July 12, so the DHS did not meet the statutory timeframe.

Brian replied in an August 7 letter, received by the DHS on August 9. Brian claimed he was misled by Hirst's July 29 letter because she did not identify him "as the subject responsible for alleged child abuse." Brian also objected to the lack of statutory notice.[3] Brian requested "an opportunity to respond to the allegations of child abuse." He asked for "a written response of all allegations from all sources which you have gathered in your assessment." He stated "once this information has been provided, I will consider making an appointment to meet with you." Brian also provided a timeline, e-mails, text messages, letters, Facebook conversations, and stated: "Prior to this I had little to no contact with [J.S.] since March 15, as [O.S.] has openly defied the court order regarding

---

[3] The district court found: "As soon as Hirst was informed that Brian did not receive the parental notification, it was reissued."

custody and visitation and refused to allow any direct contact. I have retained an attorney and will be filing Contempt of Court action."

Brian knew J.S. had attempted suicide on July 4 and was refusing to speak with him; knew from his conversations with hospital personnel that they were planning to report emotional injury against both parents; and knew from a July 16 phone message that the DHS wished to speak to him about an assessment involving J.S. Although the DHS did not provide timely statutory notice, Brian had actual notice from the DHS on August 4 that allegations had been made against him. The DHS issued its initial assessment of unfounded child abuse on August 9. Thus, Brian had several days after receiving actual notice to respond to the DHS. Brian responded in an August 7 letter. Under these circumstances, we cannot conclude the lack of statutory notice rose to the level of a constitutional violation of Brian's right to procedural due process. Brian had a meaningful opportunity to present his viewpoint after he had actual notice of the allegations against him, and he chose to do so in writing.[4]

## IV. Substantial Evidence

At the administrative hearing, Brian's testimony, his exhibits, and the testimony of his witnesses pointed to the mother's acts and omissions as causing

---

[4] Brian raises a second due process challenge, claiming his rights were violated because he was not interviewed by the DHS. The relevant statute provides:

> The offer of an interview shall be made to the person prior to any consideration or determination being made that the person committed the alleged abuse . . . . The person offered an interview, or the person's attorney on the person's behalf, may decline the offer of an interview of the person.

Iowa Code § 232.71B(4)(e). After our review of the record, we adopt the district court's resolution: "This assessment did not include an interview with Brian because he chose to communicate in writing and did not take advantage of the opportunity to speak with Hirst." Brian's constitutional rights were not violated in this regard.

harm to J.S. On appeal, Brian claims there was not substantial evidence that *his acts or omissions* caused J.S.'s mental injury. During oral arguments, Brian's counsel asserted the DHS twisted the sentiments in his August 2 letter to support its claim Brian was not concerned about his daughter and emphasized Brian composed the letter before receiving notice he was the target of the DHS child abuse investigation.

Because we appreciate counsel's point regarding the unfairness of the DHS using Brian's August 2 letter to paint him in a negative light, we exclude any consideration of that letter when deciding if the record as a whole contains substantial evidence to support the agency's determination. Even excluding that piece of evidence, we conclude the State met its burden to prove by a preponderance of the evidence that Brian's acts or omissions caused J.S.'s mental injury. *See* Iowa Admin. Code r. 441-175.21.

Iowa Code section 232.68(2)(a)(2) defines child abuse involving mental injury as follows:

> Any mental injury to a child's intellectual or psychological capacity as evidenced by an observable and substantial impairment in the child's ability to function within the child's normal range of performance and behavior as the result of the acts or omissions of a person responsible for the care of the child, if the impairment is diagnosed and confirmed by a licensed physician or qualified mental health professional.

"That section reveals a clear intention by the legislature that a finding of child abuse based on a mental injury to a child's intellectual or psychological capacity may be proven if diagnosed and confirmed by a physician or mental health professional." *Taylor*, 870 N.W.2d at 272.

In our review of the voluminous administrative record and the hearing transcript, we find the following information sufficiently undergirds the agency's conclusion that Brian's conduct toward J.S. constituted child abuse causing mental injury. The connection between Brian's conduct and J.S.'s mental injury was suggested by J.S. in her suicide note. In the note, the teenager was critical of how Brian treated her and her siblings. J.S. begged Brian to change his behavior to be a better parent to her younger sister and brother. She told the hospital staff her father was ineffective in communicating with his children and "repeatedly threatened or destroyed his children's electronic equipment."

Dr. Boyum, who treated J.S., named both parents in a report of mental injury filed with the DHS. During her treatment, J.S. told Dr. Boyum she was afraid of Brian after an incident in March 2013 when he reportedly dragged her upstairs to her room and threw her on the bed.[5] J.S. told the doctor she then moved into her mother's home, where she was subjected to verbal abuse and demoralizing criticisms. Finding a correlation between the behavior of both O.S. and Brian and J.S.'s mood and impairment, the doctor filed the report for mental injury and diagnosed J.S. with major depressive disorder and adjustment disorder with anxiety. The hospital discharge notes state:

> As the hospitalization progressed, [J.S.] remained rather easily tearful about her social situation, feeling that she did not see much hope in living with either parent. She said that "she would run away," and "would be better off dead" [than] living with her

---

[5] Twice during March 2013, J.S. told this version of the events to the police. But when the DHS investigated the incident, she changed her story, and the DHS labelled the incident "unfounded." Thus, during her hospitalization, J.S. told Dr. Boyum the original version of the interaction with her father.

father,[6] and remained hopeless that her mother would change in how she publically shamed [J.S.] and focused on negative behavior, which hurt [J.S.'s] self-esteem.

A hospital social worker told CPW Hirst that the conduct of J.S.'s parents led to the girl's depressive symptoms and each parent blamed the other for J.S.'s suicide attempt and mental health issues. According to the social worker, the parents saw no need for treating J.S. with medication recommended by the doctor, instead each parent asserted that placing sole custody with him or her would serve as a "cure" for J.S.'s diagnosed mental illness.

In a July 29, 2013 phone call with Hirst, Dr. Boyum stated his belief "the parents' behaviors and actions have led to [J.S.'s] depressive symptoms, poor school performance, and [J.S.] attempting suicide." Dr. Boyum discussed his interactions with O.S. and Brian, stating each parent's "main motivation is the external issues, the ongoing court battle regarding custody of the children, instead of meeting the emotional needs of the child."

CPW Hirst's November 5, 2013 letter to the county attorney seeking a CINA petition discussed Brian's behavior after the founded assessment and when the DHS was offering of services to the family:

> A family team meeting [FTM] was held on October 14, 2013 . . . .
> The father refused to answer many of the questions aimed at creating case plan goals and/or general questions about the family. He made statements to the effect that since he does not believe the [DHS] should be involved; there is no need for case plan goals. He was unwilling to discuss how to better communicate with [J.S.] and how to address her emotional needs, because he does not believe he has a poor relationship with his daughter. The father left the

---

[6] Three days after her suicide attempt, J.S. attended an individual therapy session and stated she "does not want to go to her father's house due to physical abuse problems in the past." But she stated a willingness to work with a hospital program "to learn about healthy ways to manage her difficult emotions."

FTM prior to its completion because he said there was nothing further to discuss . . . . *In short, both parents seem oblivious to the impact their unhealthy actions and communications may have on all their children.*

*. . . . The father . . . blame[s] the DHS, the provider, the mother, the mental health professionals, and the police for the current situation.*

*. . . . [The] DHS does have concerns about whether the children's emotional needs are being met in either parent's home.*

(Emphasis added.)

After her hospitalization, J.S. "basically refused to have any contact with her father. She did agree to see him on one occasion; the contact did not go well," according to a February 2, 2014 DHS report. The DHS report recounted feelings expressed by J.S. that her father was "mean to her." The DHS asked Brian to engage in anger management sessions; Brian said he needed additional information before he would do so. The report also noted J.S. agreed to therapy only "if her parents do not choose the therapist and if her parents do not go with her." The report continued: "All three children report the conflict between their parents is a constant stressor and they often feel stuck in the middle. They all report that each parent blames the other for the divorce and for all of the children's emotional issues." Finally, the report concluded:

> In short, . . . there has been little progress in regard to the parents being able to set aside their own anger, feelings, and needs to adequately address the emotional needs of all three children. The parents' relationship has remained contentious . . . . In some regard, the father is more discreet and covert [concerning] his disapproval of the mother, he [is] not continually say[ing] disparaging remarks about the mother directly to the children, but he does to others, and the children are aware of this . . . . [H]e exhibits extremely controlling behavior toward the mother, the children, the DHS, and the provider.[7]

---

[7] The report addressed Brian's interactions with the DHS and the provider:

. . . .

The parents continue to blame each other for the children's emotional issues, and although the parents are willing to allow the children to access therapy services, unless their behavior changes in regard to each other and toward their children, it would appear the emotional harm caused to the children will simply worsen.

In late April 2014, J.S. completed a psychological evaluation. During the evaluation J.S. reported "her father does not tell her things about her mother, but will still attempt to portray her mother in a negative light." She described her father as "manipulative and controlling." The testing suggested J.S. "likely feels overwhelmed by anxiety, tension, and depression" and also "suggests she is likely functioning at a very low efficiency level and minor stressors can lead to emotional deterioration." The clinician noted a diagnostic impression of major depressive disorder and adjustment disorder with anxiety. The clinician suggested continuing therapy, "but she would also likely benefit from anti-depressant medication." The clinician opined J.S. has "a vast amount of potential" and is experiencing "significant home stress." The clinician hoped her parents "will begin to focus on all the positives she offers."

The ALJ's lengthy decision accurately set out the contested hearing's evidence in detail. The ALJ found the case "difficult and close," believed the mother "was largely responsible for the conflict" in the family over the past

---

Throughout the course of the family's involvement with the DHS, the father has insisted that the DHS enforce [the Colorado order granting him physical care]. The DHS has consistently explained to the father, that unless the children are adjudicated by the juvenile court, and/or the DHS can prove an imminent risk of harm to any of the children in either parental home, the DHS cannot intervene in the custody issue. Even though this has been explained to the father on numerous occasions, he has continued to insist that the DHS is not enforcing the order and is allowing the mother to keep his daughter from him.

several years, and also believed the mother "has been in large part responsible for the mental injury that J.S. clearly suffers from." Nevertheless, the ALJ found Brian contributed to J.S.'s condition by (1) his initial reluctance to seek therapy or other services for J.S., (2) his initial unwilling to discuss ways to communicate with J.S. and how to address her emotional needs, and (3) not aiming his communications with the DHS at "solutions and treatment, but rather on laying blame," which "cannot be a parent's focus." The ALJ findings are supported by the record.

Continuing, the ALJ found "two other important factors"—Dr. Boyum's July 29, 2013 letter and J.S.'s CINA adjudication—support the DHS child abuse assessment against Brian. We discuss the CINA adjudication below. As to Dr. Boyum's letter, like the district court, we conclude the letter provides support for the founded assessment and registry placement. The district court decided substantial evidence supported the agency's findings, pointing to information in the record showing Brian's inability or unwillingness to accept "the past turmoil has continued to adversely impact J.S. as she enters her teen years to the point she attempted suicide." The court also noted evidence that after J.S. left the hospital, Brian continued to focus on his "toxic relationship" with O.S. and not on J.S.'s needs. We reach the same conclusion as the district court.

### V. CINA Adjudication

Brian argues the ALJ's deference to the CINA adjudication constituted an application of the doctrine of issue preclusion "in all but name." Brian claims consideration of the CINA adjudication "essentially swung" the case against him and an "overbroad reliance on the CINA proceeding moots the point of the

separate contested case proceeding," constituting error by the agency and the district court. Brian relies upon *Grant*, 722 N.W.2d at 173-75, to support his issue-preclusion argument.

In response, the State notes the legislature amended the code to "specifically authorize issue preclusion in appropriate cases." *See* 2012 Iowa Acts ch. 1082, § 5 (amending Iowa Code § 235A.19(3)(d)). Under the amended statute, the department may defer the contested hearing until the conclusion of the adjudicatory phase of a pending CINA proceeding either on its own initiative or at the request of "any party to the contested case proceeding." Iowa Code § 235A.19(3)(d). Thereafter, a CINA adjudication "in a district court case relating to the child abuse data or findings may be determinative in a contested case proceeding." *Id.* Accordingly, under the plain language of the statute, the agency is authorized to give weight to a prior CINA adjudication of the same issue. *See id.*

In resolving this challenge, the district court stated the ALJ had "noted the higher burden of proof of clear and convincing evidence required to adjudicate a child on the grounds of 'mental injury caused by the acts of the child's parent.'" The district court then found the CINA proceeding was fully contested, with Brian represented by an attorney who "was able to call witnesses and cross-examine witnesses." Noting the ALJ "appears to have placed great weight on the CINA adjudication in his final determination," the court concluded "the deference and weight given to the CINA adjudication by the agency was proper." We agree.

**AFFIRMED.**